### THE SIR ROBERT FERNIE.

(District Court, D. Washington, W. D.    September 2, 1899.)

#### No. 197.

SALVAGE—AMOUNT AND APPORTIONMENT—EVIDENCE CONSIDERED.
   The Sir Robert Fernie, a steel bark, worth from $75,000 to $100,000, and loaded with a cargo of wheat of the value of $96,000, was moored to a buoy in Tacoma Harbor, when, about 10 o'clock on a stormy night, with a southwest gale, the buoy's anchor chain parted, and the ship began drifting broadside towards the north shore. Her windlass had been taken out for repair, and she had no means of handling chain cable, and had only part of her complement of men. She sent for the tug Fairfield, which, though shorthanded, came to her assistance. Being unable to procure further help, the Fairfield, which was a new boat, by the utmost exertions, during which she severely strained her machinery, succeeded in holding the ship off the beach near which she had drifted until the wind abated, and, after five hours' work, brought her back to anchor uninjured. *Held* that, in view of the certainty that serious injury would have resulted to the cargo, and probably to the ship, but for the efforts of the tug, which involved danger to both tug and crew, the owners and crew were entitled to salvage, which was awarded in an aggregate of $5,300.

In Admiralty.    Suit for salvage by the owners and crew of the steam tug Fairfield.    Hearing on the merits.    Decree for libelants.

J. M. Ashton, for libelants.

Williams, Wood & Linthicum and H. S. Griggs, for claimant.

HANFORD, District Judge.   For services in rescuing the bark Sir Robert Fernie from a situation of peril on the night of November 2-3, 1898, the owners and crew of the steam tug Fairfield have brought this suit to recover salvage.   At the time of rendering the services the Fairfield was a new vessel, employed in a general towing business about Tacoma Harbor, and in all the waters of Puget Sound and the Straits of Juan de Fuca, having power sufficient to handle a ship of 3,000 tons in ordinary weather.   Her value was about $12,000; her usual complement of officers and men consisted of a captain, mate, engineer, fireman, one deck hand, and a boy; and her average earnings were $50 per day.   At the time of being called to assist the Sir Robert Fernie the engineer and deck hand were absent, but the engineer joined the vessel in the manner hereinafter related in time to relieve the fireman, who had been, during the night's experiences, doing all the work in the engine room.   The Sir Robert Fernie is a large, steel-hull, four-masted bark, nine years old at the time of the occurrence, and worth, as near as I can estimate her value, from $75,000 to $100,000.   She was loaded with a cargo of 3,916 long tons of wheat, of the value of $96,000, and destined on a voyage around Cape Horn to some port in Great Britain.   Being thus loaded, she was moored to a buoy in Tacoma Harbor, awaiting the completion of a new windlass to replace her old one, which had been taken out on account of being damaged and unserviceable.   Her steam winch was out of order, so that during the night in question she had no means of handling chain cables.   Besides her lack of equipments for contending against the elements, she was not fully manned, only part of her usual complement of able seamen being on board, and her officers seemed to have but little confidence in the loyalty of the men she did have.   It is proved by statements afterwards made by her captain, and also by the answer verified by him, that one of the most important acts of seamanship during the night was performed by the ship's cook; and it is made a matter of record in the ship's log, written by the first mate, and signed by the captain, three mates, and two able seamen, that in heaving the sounding line it parted, and about 70 fathoms of line was lost; and on examination of that part of the line which remained on the reel it was found that the line had been cut at the place where it parted, and also cut in other places, by some person, maliciously.   There was considerable delay in some of the important operations during the night, which the captain ascribed to the unwillingness of his men, and he expressed his belief that they had tried to run the ship ashore.   The buoy to which the ship was moored was placed in the harbor for the accommodation of ships by the city government, and consisted of a raft, attached to a 5,500-pound anchor by 60 fathoms of chain cable, weighing 15,000 pounds. When the buoy was picked up, it was found that the chain cable had become unshackled, or had parted, near the anchor, for about 60 fathoms of chain was still appended to the log raft.   This had been dragged by the ship across the bay to a place less than one-fourth of a mile from the north shore, where the depth of the water is only about 50 feet.   At that place the chain dragging on the bottom must have held the ship's head so that the wind would make her swing shore-

ward, and, allowing for the slope of the beach, there could not have
been much water under her stern.    The night of November 2d was
dark and stormy.    There was a heavy rainfall, and a southwest gale
prevailed during most of the night, with frequent squalls of great vio-
lence.    The condition of the weather is established beyond question
by the testimony of well-known citizens, who have no interest to in-
duce them to give false testimony, and who have had lifelong ex-
perience in battling with the elements upon the ocean.    Their testi-
mony is corroborated by reports of the storm published next day in
the daily papers, by the fact that the ship dragged the buoy and 60
fathoms of chain across the bay, by the conduct of the captain of the
Sir Robert Fernie in calling for assistance, by the record of the ship's
log, and by the record of the United States weather station at Ta-
coma, which shows the velocity and direction of the wind during the
night, as follows:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 9:40 p. m. | 26 | miles | per | hour | from | the | southwest. | |
| 10:15  " | 20 | " | " | " | " | " | " | |
| 11:45  " | 22 | " | " | " | " | " | " | |
| 12:01 a. m. | 21 | " | " | " | " | " | " | |
| 1:02  " | 10 | " | " | " | " | " | " | |
| 2:16  " | 10 | " | " | " | " | " | " | |
| 3:27  " | 9 | " | " | " | " | " | " | |
| 4:00  " | 12 | " | " | " | " | " | " | |
| 5:02  " | 11 | " | " | " | " | " | " | |

In such weather the water would necessarily be rough, and the
testimony shows that the doors of the engine room of the Fairfield
had to be kept shut to keep the water which was breaking over the
sides of the steamer from flooding the engine room.    And yet in the
face of these incontrovertible facts the captain of the Sir Robert
Fernie and his subordinate officers and the seamen whom he called as
witnesses have endeavored to minimize the merit of the services ren-
dered by the libelants by swearing that the weather was fine, with
only light breezes with occasional puffs, which amounted to nothing,
and that there was no sea on; Capt. Cannon himself going to the ex-
treme of absurd prevarication by swearing that at about 2:30 a. m.,
when the ship was finally brought to a place of safety, and moored,
there was no wind, and the water was smooth as oil.    The testi-
mony of these witnesses appears to be so untrustworthy that I reject
it entirely as to all matters in which they contradict other witnesses.
During the fiercest part of the gale—about 9:30 p. m.—the ship was
discovered to be drifting, and as soon as practicable the captain dis-
patched a boat's crew to request the Fairfield to come to his relief,
and at the same time blue lights were burned as a signal.    Those on
board the Fairfield responded with commendable promptness, not
waiting to send for the engineer, but went out in the gale as soon as
sufficient steam could be made, arriving alongside of the ship on the
weather side between 10 o'clock and 10:30.    Instead of taking the
towline which the tug was ready to pass on board, Capt. Cannon re-
quested that the tug come alongside, and that her captain should
come on board his ship for consultation.    As the result of the consulta-
tion which was held, more blue lights were burned as a signal of dis-
tress, and the ship's boat crew was again sent ashore, accompanied

by the mate of the tug, for the purpose of securing another tug, be-
cause Capt. Cannon was excited, and he did not have confidence that
a tug of the Fairfield's capacity would be able to save his ship, which
was then being driven broadside before the southwest gale towards
the northern shore of the harbor.    The ship's yards were then braced
around to point towards the wind, and the tug, short-handed as she
was, the mate, engineer, and deckhand being absent, undertook the
heavy task of pulling the ship's head to the wind, and towing against
it.    To watch the towline, steer the tug, direct the movements of the
tug and the ship, work the engine, and stoke the furnace, the cap-
tain, fireman, and boy on board the Fairfield all had to do double
work, and the engine and boiler of the tug were severely strained by
the efforts made to increase her power to the utmost.    The evidence
shows that to prevent the loss of any force the safety valves were
screwed down, and the pressure of steam was raised considerably
above the full limit specified in the tug's certificate of inspection, in
consequence of which considerable expense was incurred afterwards
in readjusting the different parts of the engine, and for new bolts and
rivets and repairs to the boiler.    By the utmost exertions of the tug
she was able to hold the ship from going ashore, and when the wind
moderated she managed to pull her some distance towards the south-
ern shore, but during the succession of squalls which were en-
countered the tug and her tow were frequently driven astern.    After
considerable delay the ship unshackled her cable from the buoy, and
when the wind moderated—after 1 o'clock—the tug succeeded in
towing her back to a mooring near the coal bunkers on the southerly
side of the bay.    When the worst part of the struggle was passed,
the ship's boat returned, having been unsuccessful in finding another
tug in condition for immediate service, but she brought the Fairfield's
engineer, who then relieved the exhausted fireman.    Considering the
state of the weather and the disabled condition of the Sir Robert
Fernie, without the means or the men to safely handle her anchors,
I consider the probability so strong that it amounts to certainty that
she would have been driven upon the beach if she had not been saved
by the exertions of the Fairfield and her crew; and, loaded as she
was, the consequence of being cast upon the beach in the storm would
necessarily have been quite serious.    If she had escaped the danger of
striking on rocks, still the incline of the beach would have caused her
to list over towards the water, if she had been driven on broadside,
or, if otherwise, one end would have been depressed, and in either
position the incoming tide would have filled her with water, and
ruined her cargo, before adequate appliances to lift her could have
been obtained.    Under the most favorable conditions which could be
expected, she would have been obliged to meet heavy bills for ex-
penses of surveys, unloading, lightering, reloading, and probably
docking.    For being saved from such peril, Capt. Cannon offered the
captain of the Fairfield as recompense the sum of $30, which being
declined the offer was increased to $50; and when the answer was
filed in this action $200 was deposited in court, which the answer al-
leges is reasonable compensation; and after this suit had been com-
menced an agent of the firm which loaded the Sir Robert Fernie

sought an interview with the captain of the steam tug, and made a tender of his good offices in arranging a compromise, in which he expressed disapproval of the niggardly offer which had been made by Capt. Cannon, and expressed his own idea that $250 would be reasonable compensation, and he has testified in this case that Capt. Burley assented to that proposition.    It is obvious, however, that, instead of really assenting to his statement, Capt. Burley did nothing more than decline to give it serious consideration.    One part of the defense in the case is founded upon the claim that the services of the Fairfield were rendered in pursuance of a contract made during the afternoon preceding the occurrences narrated.    The evidence shows that Capt. Burley did offer to tow the Sir Robert Fernie to a different mooring buoy without making any charge therefor, which offer was declined.    Capt. Burley also at the same time promised to come to the relief of the ship during the night if his assistance should be required, and also promised that he would not make any unreasonable charge.    Capt. Cannon himself does not pretend that any definite arrangement was made by which he retained the Fairfield in his service during the night, or became obligated to pay any sum for her services, unless, in case of an emergency, he should call for her to come to his relief.    This shows that there was no contract binding upon either party, or which can stand in the way of the libelants' claim for compensation for a salvage service.    I find from the evidence that the libelants, with promptness and courage, exposed themselves and their vessel to hardship and peril in the endeavor to rescue the Sir Robert Fernie and her cargo, and their efforts were in the highest degree successful.    The value of the property saved is a large amount, compared with which the amount awarded to the libelants as their compensation is inconsiderable.    The time during which the libelants were engaged in the service was something less than five hours. Considering this fact and all the circumstances developed in the evidence, and not particularly mentioned, as well as all the facts which I have mentioned, I regard as reasonable compensation, and therefore award, to the libelants the following sums, viz.:   To the owners of the Fairfield, $3,000; to Captain Burley, $800; to Arthur Thompson, the boy, and Joseph Herbert, the mate, each $400; to Oscar Lawrence, the fireman, $500; and to George A. Kingsbury, the engineer, $200.