### THE QUEEN ELIZABETH.

### FULTON v. HOLMES et al.

(District Court, E. D. New York. March 30. 1900.)

1. COLLISION—CONSTRUCTION OF SAILING RULES—VESSEL "RUNNING FREE."
    A ship closehauled, and sailing within 6½ points of the wind, is not "running free," within article 17, subd. 3, of the navigation rules, and is the privileged vessel, where a crossing vessel is admittedly running free.

2. SAME—EVIDENCE—DIRECTION OF WIND.
    Where the recorded official observations of the keepers of a lighthouse and a lightship agree, and fix with reasonable certainty the direction of the wind at the time and place of a collision, such evidence will be accepted, rather than the testimony of the crew of either vessel, when the testimony of the two crews conflicts.

3. SAME—EXCUSE FOR FAILURE TO OBSERVE RULES—DARKNESS.
    A sailing vessel may be excused from fault in failing to take the action required by the rules to prevent collision with a crossing vessel, which is in fact privileged, when, although exercising due vigilance, she is unable to determine (by reason of the darkness and the direction of the wind), from the lights of the other vessel, on what course she is sailing, and which is the privileged vessel; but such excuse cannot be invoked where, by reason of the inefficiency of her lookout, she failed to discover the approaching vessel until the two were in close proximity, and she had no time to study the situation.

4. SAME.
    A ship which, in a suit for collision, claims, and is found, to have been the privileged vessel, cannot be excused for disregarding the duty to keep her course, imposed by such privilege, except upon ample evidence of justification; and where, but for her failure to observe such requirement, the collision might not have occurred, she must be held in fault therefor.

In Admiralty. Cross libels for collision.

Owen & Sturges (Mr. Sturges, of counsel), for John Holmes and others.

Butler, Notman, Joline & Mynderse (Mr. Mynderse, of counsel), for the Queen Elizabeth.

THOMAS, District Judge. At about 2:30 a. m. on April 23, 1898, at a point in the Atlantic Ocean some 25 miles southeasterly from Sandy Hook lightship, and about the same distance in a southwesterly direction from Fire Island light, a collision took place between a four-masted schooner (the Percy Birdsall), of 1,071 tons register, 217 feet in length, laden with coal, and the ship Queen Elizabeth, 1,699 tons register, 248 feet in length, in ballast. The ship was bound from

Havre to New York; and the schooner, from Philadelphia to Providence. The schooner claims that she was sailing N. E., with headsails drawing, and that the wind was S., or S. by W., and that it was carried 3 points on her quarter. The ship contends that she was sailing N. W. by W. ½ W., corrected from W. by N. ½ N., as logged, on account of 10° easterly deviation of the compass, which, for convenience, has been regarded as 1 point deviation; that the wind was S. W., corrected for deviation from S. W. by S. as logged; and that she carried the wind forward of her beam, sailing closehauled, 6½ points from the wind. The schooner erroneously claims that the ship's corrected heading was W. ½ N. When the deviation is easterly, the actual course is as many degrees to the right of the compass course as there are degrees of deviation. Which vessel should have kept out of the way? It is conceded that if the ship had the wind so that, taking into account her desired course, she could run free, it was her duty to keep out of the way, and that otherwise such duty fell to the schooner. Concededly, the schooner was running free; but she was not dead before the wind, if, as her crew testify, her foresails were drawing. Undoubtedly the ship was closehauled. If regard be had to the adjustment of the sails alone, the ship was the privileged vessel. But it is urged that the question is not whether the ship was closehauled, but, rather, whether she carried the wind so that she could run free. In other words, was she properly closehauled? The question whether the ship, headed N. W. by W. ½ W., was properly trimmed, depends upon the direction of the wind. If the wind was S. W., as she claims, she was within 6½ points of it. If the wind was S. or S. by W., as the schooner contends, the ship was at least 9¼ points from the wind, and obviously free. Hence the inquiry is, was the wind S. W. or S. or S. by W., or somewhere between these points? But when is a ship running free? If she were 7¼ points from the wind, would she be regarded as sailing free, or would she not be so regarded unless the wind were on or aft her beam? What must be the relation of the wind to a vessel, to bring her within the words "running free," as used in article 17, subd. 3? It is usually stated that a square-rigged vessel cannot sail nearer than within 6 points of the wind. If she be sailing within 7 points of the wind, she is sometimes said to be sailing 1 point free. In The Franconia, 4 Ben. 181, Fed. Cas. No. 5,049, Judge Blatchford mentioned a schooner as closehauled, sailing within 5 points of the wind, although a schooner can in fact come nearer to the wind. An allowance for variation of the wind was made in The Mary C., 1 Hask. 474, Fed. Cas. No. 9,201, where the wind was unsteady and baffling; and a vessel nearly closehauled with the wind, sometimes 1 or 2 points free, was held not to be deprived of the right of way. The attention of the court has been called to the statement of a German writer that "every vessel whose steered, apparent course forms an angle with the wind direction of from three and a half points to seven and three-quarter points sails 'by the wind.'" He also says that the standard or criterion to distinguish between vessels on the wind and those sailing free is the relation of the line of the keel with the direction of the wind, and not the position of the sails.

Prien, Der Zusammenstoss von Schiffen (Collision of Ships),—Berlin, 1896,—p. 317. In Mars. Mar. Coll. (4th Ed.) p. 448, Mr. Marsden states:

"'Running free' appears to mean not closehauled; but the phrase is not happily chosen, to describe a ship that has the wind a point or two free, but forward of the beam."

In The Earl of Wemys, 6 Asp. 407, the rules involved were:

"Art. 14a. A ship which is running free shall keep out of the way of a ship which is closehauled."

"Art. 22. Where by the above rules one of two ships is to keep out of the way, the other shall keep her course."

It is stated in the syllabus that:

"The custom of sailors to treat sailing ships when in the trades as closehauled ships, when they are sailing a point or two from being as closehauled as they can lie, does not affect the legal construction of the regulations; and the court will not exonerate vessels so sailing from duties applicable to sailing ships in other latitudes. Semble, a sailing ship is closehauled, within the meaning of article 14, if she is sailing half a point free of the nearest she can lie to the wind, but not if she is two points off."

Lord Esher says:

"Then comes another question: If a vessel is, within the meaning of rule 14, clause 'a,' a closehauled vessel, what is the meaning of 'keeping her course,' in rule 22, as applied to that? A vessel may be closehauled; that is, sailing on the wind, with her yards not so pointed as they could be; that is to say, her yards not square, or not so placed as they would be if she was sailing free. She may be sailing on a wind,—that is, closehauled, within the meaning of the first of those rules,—although she is not as closehauled as she can possibly be; that is, jammed close to the wind. I believe that is the nautical phrase for it. If she is sailing half a point off that, the cases seem to have said that she is nevertheless closehauled, within the meaning of the rule. The phrase 'closehauled' does not mean jammed close to the wind. It means more off than that. How far could she be sailing, and yet be said to be closehauled,—how far off, being close jammed to the wind? Half a point off, I think everybody is clear that she would still be a closehauled ship. I think we are told that she might be sailing a point off, and yet be considered, within the first part of that rule, a closehauled ship. Whether that would be so if she were more than that,—say, a point and a half,—I am not quite so certain; and it does not seem necessary to consider it in this case, as she was here two points off,—two points or more. I should say she was no longer a closehauled ship."

In The Privateer, 9 L. R. Ir. 105, cited by Mr. Marsden, it seems to have been thought that a ship with the wind about 2 points free was closehauled. Attention has been called to the Seaman's Manual, where it is stated that a vessel is going free when she has a fair wind and her yards braced in, and that to "brace in" yards is to lay them nearly square, while to "brace up" is to lay them more fore and aft.

Whether the vessels should have been trimmed closehauled or free, within the meaning of the rule, will be considered. The schooner's contention is that the fact that she had her sails adjusted to a wind on her starboard quarter shows that the wind was on her starboard quarter, or about S. or S. by W.; but that the fact that the ship's sails were trimmed to sail close by the wind does not show that the wind was forward of her beam, so as to permit her suitably to sail closehauled. There is here an inconsistency of position, as the ship was of

a good class, with competent officers and crew, and the evidence leaves an impression that she was provided in this regard as well or better than was the schooner. But the schooner urges that the ship did not wish to make the greatest profit of the wind, as she was nearing port, and that she therefore continued closehauled, as she had been so trimmed some hours previously, and that she was not taking advantage of all her available sails. It is true that the captain of the ship states that he was approaching port, and was preparing to meet other vessels; but this would hardly justify the conclusion that he trimmed his sails to sail close by the wind, when in fact the wind was abaft his beam. In that case he was sailing closehauled, some 10 or 10½ points from the wind. The whole demeanor of the ship's watch indicated a decrease of sail, and that the sails were braced sharp, and necessarily so. But the anxiety of the schooner to avail herself of all aids to her journey is inconsistent with her alleged N. E. heading, which carried her to the northward of her true course, and, if continued, would have brought her upon Long Island shore. The schooner produces the evidence of the master and mate of the schooner Horace G. Morse, which was bound from Philadelphia to Lynn, Mass., and was sailing N. E. by E., or 1 point to the eastward of the Birdsall's alleged N. E. course; and such would be the seemingly more profitable course for the Birdsall. The subject will recur, but it is here mentioned in connection with the argument that the schooner was, and the ship was not, making the most of the opportunities presented. At this point it may be observed that the claim of each vessel as to the direction of the wind is unsuited to the sail adjustment of the opposite vessel. With the wind S. W., as the ship claims, the schooner should have been sailing wing and wing, at least her headsails should not have drawn, provided she was sailing N. E. On the other hand, if the wind was S. or S. by W., as the schooner claims, the ship should not have been sailing closehauled on the heading claimed by her. Hence there must be consideration of other evidence. The members of the crew of each vessel support her claim as to the direction of the wind and heading, with the usual adherence to their vessel. There is the customary persistency of statement respecting the precise thing necessary to exonerate their vessel, as well as the wonted inaccuracy, ignorance, and lack of observation in the case of certain of the crew. From this usual exposition of the crews, decisive proof of the direction of the wind may not be obtained. Therefore the next resort must be to evidence of persons unconnected with the vessels. These are the master and mate of the Morse, mentioned above, the master of the Sandy Hook lightship, and the keeper of the Barnegat light. The master of the Morse, testifying in November, 1898, did not recall his destination on that voyage, but recollected passing the Birdsall; reading her name; the exact course she was on; his own exact course, N. E. by E.; the direction of the wind, S. by W. The mate of the Morse stated that the Morse was bound for Lynn, Mass., and not for Boston, as the master appeared to be impressed. He agreed with the master that the Morse was headed N. E. by E., and recalled that the wind was from S. by W. to S. S. W. The mate states that the wind did not change from sunset to about 5:30

o'clock the following morning, and the master seems to think that there had been no change in the southerly wind from the time of his passing 5 miles off Cape May until the following morning after 4 o'clock. If the case did not turn on so nice a margin, the general recollection of these witnesses might be helpful; but the matter requires accuracy of information and recollection, and memory of conditions that the witnesses had no occasion to recollect, and which must have been observed without careful attention, is not entirely acceptable. The mate of the Morse keeps the wind from sunset to sunrise within the limits of a point, and allows it to go no further west than S. S. W., and no further south than S. by W., while the master places it at S. by W. This location was sufficient to keep it abaft the beam of the ship. According reasonable credit to this evidence, that of the keepers of the lights may be considered. These persons hold official relations to the government, and it is one of their duties to take and record the direction and other features of the wind. The Morse passed the Barnegat light some 18 or 20 miles off shore, and the mate fixes the wind then as S. by W. to S. S. W., while the captain makes it S. by W. This was at sunset, or perhaps, by the evidence of the captain of the Morse, as late as 8 o'clock. The keeper of the Barnegat light makes the wind during this time S. S. W., agreeing nearly with the mate, and within 1 point with the master of the Morse. Hence it may be concluded that in the early evening of April 23d, at Barnegat light, and 18 or 20 miles off the shore, the wind was S. S. W., or within a point southerly of it, and the mate and keeper of the light may be regarded as in accord in fixing the wind at S. S. W. At 8 p. m. the wind at Sandy Hook lightship was S., showing a variation of 1 point from the statement of the master of the Morse at about the same time. Now this wind from Barnegat followed the Morse and the Birdsall, and its tendency was constantly to the westward; for at 10 o'clock at Barnegat it was S. W., and so remained 4½ hours before the collision, and for some 3 hours after the collision. The Morse was sailing about 7, and the Birdsall about 6, knots per hour. Therefore, starting with a S. S. W. wind at Barnegat, and at a point 18 or 20 miles out, in the early evening, is it unreasonable to suppose that a S. W. wind, noticed at 10 p. m. at Barnegat, did not reach the two schooners within the next 4½ hours, and, indeed, not until about sunrise of the next morning; the wind being recorded as fresh at Barnegat, which the keeper stated meant a wind traveling 15 miles per hour, while a high wind was reached when the velocity was 30 miles. This wind was traveling more than twice as fast as the schooners, and should have reached them long before 2 o'clock, even had they been going directly away from the shore. But in fact the Birdsall was only about 25 miles from shore at the time of the collision, which was not more than 7 miles further off than was the Morse when she passed Barnegat light, at which time the direction of the wind at the light and on the Morse closely agreed. It may be stated that the keeper at Barnegat made entries in his night book at sunset, 10 o'clock, 2 o'clock, and sunrise, and noted the direction of the wind only at the nearest point, and did not record half points. If, now, reference be

had to the Sandy Hook lightship record, it is discoverable that some time between 8 a. m. and 12 p. m. the wind went from S. to S. W., and remained until 4 a. m., and is recorded as high, with a choppy sea, to midnight, and then as light, with a swell sea. The wind seems to have been taken at the end of each 4 hours. At this lightship the wind had been S. W. for at least 2½ hours before the collision, and the direction ascertained at Barnegat is confirmed, although there is a difference in the velocity of the wind at the time of the collision. As the observations were taken at different hours, a close comparison of the time when the wind changed cannot be had. This evidence seems to fix about the direction of the wind at the time of the collision, even though due allowance be made for the alleged fact that the wind would change on shore at an earlier time. The Sandy Hook lightship is 8 or 9 miles off shore, and the place of collision was not more than 25 miles from that point. An examination of the official record explains, with some reason, certain of the evidence not otherwise understandable. It must be concluded from this evidence of carefully made and recorded official observations that the wind at the time of collision was S. W. The adoption of the official registry of the wind, in preference to the evidence of the crew, accords with the action of the court in The Peckforton Castle, 3 Asp. 533. Therefore it was a free wind for the schooner, and the ship was properly trimmed closehauled.

But certain difficulties at this point beset the conclusion thus far reached. Keeping in mind that the schooner's green light was opposed to the ship's red light, and that neither vessel saw or could see (according to the evidence) lights, save in that relation, it results (1) that the schooner and ship each knew that the vessels were on crossing courses; (2) that each vessel knew that the schooner was sailing free; (3) that the ship knew that she herself was closehauled; (4) that the schooner, in the night, might not be able to know whether the ship was trimmed closehauled or free, while she was headed anywhere between W. ½ S. up through the northwest quadrant to N. by E. ½ E., upon which latter heading the after screen would shut out the light, as stated by the ship's advocate. Therefore, even if the schooner in fact were entitled to the right of way, she might be unable to discover whether she had such right, because she could not determine the ship's heading, and hence whether she could sail free on a southwest wind. On account of the darkness of the night, and the inability of seeing the loom of the ship, this fact might not be determinable by the schooner until the vessels were so near together that the discovery would not enable the schooner to hold on, even though she were entitled to do so. But there are further possibilities embarrassing to the schooner. If she luffed for the purpose of discovering the ship's situation, two things might happen: First, the ship might keep on her way, and obtain the privilege, whether she was entitled to it or not; or, second, if the ship considered that she was not entitled to it, and she herself came up to the wind, collision would be quite sure to follow. If the schooner had a right to hold on, she was bound to hold on.

If she was bound to give way, it was her duty to do so. But she could do neither one thing nor the other without inviting a collision. Under such circumstances, the schooner might not be able to discover whether it was her duty to give way or to hold on, and, whatever she might do, she was liable to condemnation. Pursuant to this thought, should subdivision 3 of article 17 read as follows:

"'When both are running free, with the wind on different sides, the vessel which has the wind on the port side, should keep out of the way of the other,' and each vessel, for the purpose of fulfilling this rule, must discover * at her peril how the sails of the opposing vessel should be trimmed."

A similar state of facts was presented in The Theodore H. Rand (decided by the house of lords in 1887) 12 App. Cas. 247. Of two sailing vessels, approaching one another between 4 and 5 o'clock on the morning of February 3d, the Statesman was running free, and the Theodore H. Rand was closehauled on the port tack. It was therefore the duty of the Theodore H. Rand to keep her course, in accordance with articles 14 and 22 of the regulations for preventing collisions at sea (1884); but those navigating the Theodore H. Rand, in the belief that the Statesman was closehauled on the starboard tack, ported, whereby a collision occurred. Held (affirming the decision of the court of appeal), that since, with ordinary skill, and by the exercise of reasonable care, those navigating the Theodore H. Rand could not have ascertained that the Statesman was running free, the Theodore H. Rand was not to be deemed to be in fault, within Merchant Shipping Act 1873, § 17 (36 & 37 Vict. c. 85). Lord Herschell adopts the view and language of Lord Esher, the master of the rolls, in The Beryl, 9 Prob. Div. 137, 138, which is as follows:

"When you speak of rules which are to regulate the conduct of people, those rules can only apply to circumstances which must or ought to be known to the parties at the time. You cannot regulate the conduct of people as to unknown circumstances. When you instruct people, you instruct them as to what they ought to do under circumstances which are, or ought to be, before them. When you say that a man must stop and reverse, or, I will say, slacken his speed, in order to prevent risk of collision, it would be absurd to suppose that it would depend upon the mere fact that there was risk of collision, if the circumstances were such that he could not know there was risk of collision. I put some instances during the argument to show that this was so. * * * How can you regulate their conduct, if neither can see the other until they are close together? It is absurd to suppose that you could regulate their conduct, not with regard to what they can see, but to what they cannot see. Therefore the consideration must always be, in these cases, not whether the rule was in fact applicable, but were the circumstances such that it ought to have been present to the mind of the person in charge that it was applicable?"

Lord Fitz Gerald, in The Ceto, 14 App. Cas. 670, 691, also approves of this statement. Lord Herschell further states the rule as follows:

"The next question that arises is whether those in charge of the Theodore H. Rand ought to have known that the Statesman was running free, or, in other words, whether they could, with ordinary skill, and by the exercise of reasonable care, have ascertained what the fact was."

Lord Fitz Gerald put the rule as follows:

"The Statesman was not to blame. The Theodore H. Rand caused the calamity. It lay on her owners to establish that she was not to blame, by clear

and satisfactory proof that it was impracticable for the officer in charge, using his utmost care and diligence, to make out the situation he had to deal with in relation to the Statesman, and that, being placed in circumstances of great difficulty, he had acted to the best of his skill and judgment."

In Mars. Mar. Coll. (4th Ed.) 450, 451, there is the following statement:

"Before altering her helm, a ship must ascertain what course the other ship is upon, and how she has the wind. Her duty is to wait until she knows what the regulations require her to do. A wrong step taken by a ship in ignorance of the other's course will cause her to be held in fault if a collision ensues. Hence arise cases of great perplexity to seamen. A ship, A., closehauled on the port tack, sees a red light of another, B., ahead, and a point or two on his starboard bow. He cannot make out what is B.'s course. Not knowing which article of the regulations applies to his case, A. stands on, and at the last moment bears up, thinking erroneously that B. is closehauled on the starboard tack. At the same moment B., who has the wind free, bears up. A collision follows, for which A. is probably held in fault, because he did not keep his course. The temptation for A., on first seeing B., to bear up, go about, wear, or to take other steps which he thinks will avoid risk of collision, without regard to the regulations, is strong. The following illustration may be suggested: The wind being north, a ship closehauled on the port tack, and heading E. N. E., sees, within a quarter of a mile, and on her lee bow, a red light. The vessel to which it belongs may be either in stays, and heading N., or she may be closehauled on the starboard tack, and heading from N. W. to W. N. W., or, again, she may have the wind free, and be heading from W. N. W. to W. by S. In the first case supposed, the rapid alteration in the bearing of the light as it crossed her bows would assist her in arriving at the conclusion that the other ship was closehauled on the starboard tack, and heading about N. W., and in this case the duty of the first ship is clear, —to keep out of the way. On the other hand, if the ship to which the red light belonged were light, under low sail, and making considerable leeway, the alteration in the bearing of the light would be very slow, and it might easily be mistaken for the light of a ship having the wind free. In this case it would be very difficult for the ship on the port tack to appreciate the actual circumstances of the situation in time to comply with the regulations so as to avoid a collision."

. These illustrations present cases where the doctrine of The Rand decision might be invoked. But in the case at bar the schooner failed in preliminary vigilance. Although the ship's red light was in order and burning properly, the lookout on the schooner did not discover the same until the vessels were in close proximity; and upon such discovery the Birdsall at once assumed that it was her duty to keep out of the way, and in recognition thereof she immediately changed her course. The Rand was vigilant to discover the situation of the opposite ship, and failed. Hence she was excused. The schooner was so careless that she did not discover that there was an opposite ship until it was too late to attempt any study of her situation. It may appear now that such earlier study would have been ineffectual, but the fact cannot be known, and the court is deprived of the means of such knowledge by the schooner's inattention. In any case diligence in seeking knowledge of the ship's heading is a condition precedent to relief from the strict enforcement of the rule. Therefore, in view of her imperfect watch, and subsequent action, it is considered that it is not shown that she used ordinary skill and exercised reasonable care to ascertain the situation of the opposite vessel. This view is strengthened by the

fact that no claim of inability to make out the situation of the Elizabeth was made by the schooner either in the libel or upon the trial.

Again, it may be suggested that the schooner, if headed N. E., could not have been sailing with her booms on her port side and her foresails drawing, if the wind was in the southwest. Where a finding of fact has been reached, it is not necessary to reconcile with it all the evidence that may have been given in the case. But with reference to this objection it may be stated that it is not thought that the schooner was headed N. E. A N. E. heading was apparently not the proper one for a vessel bound for Providence, especially if she were desirous of making the most advantageous voyage. Such a course would have brought the schooner on Long Island, and no adequate reason is given for such heading. Again, the Morse, bound for Lynn, Mass., and sailing in the company of the schooner past Barnegat, was shown to be heading N. E. by E., and such a course, or one further eastward, would have been more available for the Birdsall, and therefore the one presumably pursued. The log book of the schooner does show that she was on a N. E. course; but it was made up after the collision, and it will be observed that it is almost the only occasion during the use of the log book where the heading of the vessel has been properly entered under the column provided to indicate the course. This precision, under the circumstances, is of doubtful aid.

The evidence that the Birdsall was sailing on a N. E. course, with her foresails drawing, is possibly explained by the following facts: At 4 p. m. of the previous day, at Sandy Hook lightship, the wind was southeast. It was south at 8 o'clock, and reached southwest by 10 o'clock. Hence its course was continually to the westward after 4 p. m. of April 22d. The observations at Barnegat also showed a continuing change of the wind to westward from the afternoon of April 22d. Therefore it may be inferred that the schooners Birdsall and Morse sailed on the afternoon of April 22d on courses of about N. E. or N. E. by E., and that as the night advanced the shifting of the wind to the westward was not observed by the Birdsall, but her heading was modified to take advantage of the changed wind, which tended to bring her more to the eastward, and upon her proper course. It is considered that the Birdsall was not steered nicely by the compass. The captain did not seem to know what was meant by the deviation of a compass, although he had often compared it with the compasses of other ships, and, as he said, never found any disagreement. This indicates a crude knowledge of the compass, and, while he could doubtless use it for general directions, it would be quite unsafe to depend upon his knowledge and use for close ascertainment.

Numerous arguments other than those considered have been presented by the advocates in support of their various contentions, and they have been carefully examined, but the basis of decision employed seems less conjectural; and to furnish the safer and more practicable ground for settling the question of the direction of the wind. It is considered that the ship carried the wind sufficiently

forward of her beam to enable her properly to sail closehauled, and that the schooner should have kept out of her way, and that the ship should have kept her course. But the ship claims that she was entitled to keep her course, but that she is excusable for not doing it. If a ship may be found privileged upon so narrow a margin of evidence, she should not be excused from disregarding the duty which the privilege imposed, without ample excuse. As the vessels approached each other on crossing courses, the schooner put up her helm, and went off somewhat. Perhaps it would have been better if she had luffed, but it is probable that she would have crossed the bow of the ship, had not the latter put her helm up, which caused her to go to starboard and follow up the schooner's course and strike her on the starboard quarter. It would not be profitable to discuss the angle of collision, or whether the ship's maneuver was in extremis. Doubtless her helm was put up in expectation, and to lessen the force of the contact; but it was a mistake which a master of good judgment should not have made, even under the apprehension of the threatened collision. The ship simply pursued the schooner, and the collision was of greatly increased probability. The ship should have kept her course, or, if action seemed imperative, she should have put her helm down and headed up to the wind. It is the disposition of courts to hold that the privileged vessels should keep their course, or furnish good reason for not doing so. In this case the ship did not keep her course, and did something tending towards, and not away from, collision. The damages and costs should be divided.