[No. 11733. Department One. June 1, 1914.]

H. E. PETERSON *et al., Respondents*, v. C. W. ARLAND *et al., Appellants.*[1]

JURY—JURY TRIAL—DEMAND—WAIVER—STATUTES — CONSTRUCTION. The amendment of the act of 1903, providing that the parties "will" be deemed to have waived a jury trial unless demanded and fee paid, by Rem. & Bal. Code, § 316, to read that they "shall" be deemed to have made such waiver in such event, cannot be construed as intended to make the demand and prepayment of fees mandatory, where the real purpose of the amendment was to insert a provision allowing return of the fee in case of settlement of the suit; hence a request for a jury trial may be granted, although not demanded at the time required by the act, in view of Id., § 318, preserving the power of the court to authorize a jury trial in any case whether demanded or not.

APPEAL—HARMLESS ERROR—INSTRUCTIONS—REQUESTS. It is not reversible error to fail to preface instructions by a statement of the issues, when no request was made therefor and the issue was a simple one.

[1]Reported in 141 Pac. 63.

EVIDENCE—OFFICIAL RECORDS—WEATHER BUREAU. Upon an issue as to the amount of rainfall at a certain place, the records of the nearest Federal weather bureau station are admissible for what they are worth, although the station was a considerable distance away.

NAVIGABLE WATERS—OBSTRUCTIONS—LOG JAMS—INJURY TO LANDS —LIABILITY—NEGLIGENCE. One using a floatable stream for the transportation of logs owes a positive duty to riparian owners to use reasonable care in looking after logs placed in the river, to prevent the formation of log jams and to remove jams within a reasonable time, where injury to riparian lands would result therefrom.

APPEAL—HARMLESS ERROR—INSTRUCTIONS. Where an instruction specifying the things which constituted actionable negligence was so definite that the jury could not have been misled, the addition of the words "or otherwise" was not prejudicial.

NAVIGABLE WATERS—OBSTRUCTIONS—LOG JAMS—INJURY TO LANDS —REASONABLE USE—EVIDENCE. The right of floatage implies only reasonable use, and not that the river may be jammed at low water in anticipation of freshets; and the piling of logs to a height of fifty feet in a shallow stream during low water is necessarily dangerous to riparian lands.

SAME—OBSTRUCTIONS—LOG JAMS—INJURY TO LANDS—MEASURE OF DAMAGES. The measure of damages to riparian lands caused by a log jam, is the value of the lands totally destroyed, and the diminished market value of the remaining land, if any, by reason of its being endangered by the changed course of the river.

APPEAL—HARMLESS ERROR—INSTRUCTIONS—REQUESTS. An incomplete instruction on the measure of damages cannot be urged as ground for reversal, where there was no request for a more correct instruction on the subject.

SAME. It is not prejudicial error to refuse requested instructions which are covered in the general charge.

WATERS AND WATER COURSES—RIPARIAN RIGHTS—DIVERSION—OLD CHANNELS. Where an old channel in a river has been obstructed and filled for many years, riparian owners have the right to insist that its status shall not be disturbed by turning into it the natural and apparently permanent course of the stream at the time the right is questioned.

SAME—RIPARIAN RIGHTS—PROTECTION OF BANKS. Riparian owners have the right to protect the banks from overflow by reason of freshets, so long as they do not deflect the current to the injury of other riparian owners.

NAVIGABLE WATERS—OBSTRUCTIONS—LOG JAMS — INJURY TO LANDS —INSTRUCTIONS. In an action by a riparian owner for damages to

land caused by a log jam, a requested instruction that plaintiffs had no right to protect their lands by placing any protection work in an old bed of the river, and that defendant would not be liable for damages caused to the land by its logs by jamming against plaintiff's protection works, is properly refused, other instructions fairly covering the only part of the request which would have been proper in any event.

SAME—INJURY TO LANDS—DAMAGES—EVIDENCE—SUFFICIENCY. A verdict for four thousand dollars for damages to riparian lands is sustained by evidence that seven acres of meadow, worth $172.50 per acre, were washed away, and that forty to sixty acres of the remaining meadow land was damaged to the extent of half its value, by being endangered by the change of the river bed, and rendered liable to total destruction.

APPEAL—REVIEW—HARMLESS ERROR—INSTRUCTIONS. Error in instructions in failing to state that the measure of damages was the market value of land, is cured where special interrogatories submitted advised the jury of such fact.

Appeal from a judgment of the superior court for Chehalis county, Sheeks, J., entered June 18, 1913, upon the verdict of a jury rendered in favor of the plaintiffs, in an action in tort, after a trial on the merits. Affirmed.

*J. A. Hutcheson* and *A. Emerson Cross*, for appellants.

*W. H. Abel* and *A. M. Abel*, for respondents.

ELLIS, J.—This is an action for damages to the plaintiffs' farm which, it is claimed, were caused by the negligence of the defendants in allowing their saw logs to form a jam and remain in the bed of the Wynooche river, backing up the water, diverting the channel against the plaintiffs' land and eroding it. The Wynooche river is an unmeandered stream, not navigable for any purpose except for the floating of logs. The plaintiffs' farm, which they have owned since 1909, comprises a tract of about 268 acres, located in the adjoining sections 28 and 33, township 18, north, Range 8, west W. M., in Chehalis county. The Wynooche river flows through the land in section 28 and along the westerly side of that section in 33. The land is, for the most part, low bottom land, and

this part of the river has, in years past, shifted its bed over
an area of about 1,500 feet in width, there being two prin-
cipal channels which it has occupied at different times since
about the year 1882. These may be designated as the east
and west channel. These channels separate at a point about
1,600 feet north of the line between sections 28 and 33, the
east channel running in an irregular course generally from
northwest to southeast, across the plaintiffs' land, and the
west channel, which, apparently, has always been the main
channel, running almost parallel with the east channel from
where they separate at the north for a distance of about
600 feet, when it takes an abrupt curve to the west for about
700 feet, and then runs in a long, regular curve to the south-
east, the two channels uniting again about 1,500 feet south
of the line between sections 28 and 33.

These two channels are separated by a chain of gravel bars
and islands, some of them well above the bed of the stream,
and covered with brush and small timber; others mere gravel
bars. One of these gravel bars lies between the two channels
where they separate; another immediately south of this at
the point where the west channel takes its curve to the west,
and the third is an island covered with brush and small tim-
ber at the upper end and is a gravel bar at the southerly end.
This extends from about 300 feet north of the section line
above referred to, to the point of union of the two channels
about 1,500 feet south of that line. Between the first two
gravel bars above mentioned, is a cross-channel about 150
feet wide, connecting the east and west channels, and between
the middle gravel bar and the island is another cross-channel
about 200 feet wide.

Since the evidence is in sharp conflict as to the past history
of these channels, and as to where the main body of the water
has run from time to time, and as to what jams have been
formed by the logs of the defendant, and when, thus making
all of these things questions for the jury, we shall not con-
sume space by any attempt to make a complete, connected, or

critical analysis of the voluminous evidence. It will only be necessary to give a bare outline of that sustaining the plaintiffs' theory, with which the jury evidently found.

It fairly appears that, for over ten years prior to January, 1911, the river had entirely abandoned the east channel, which had become completely filled with gravel and silt. In November, 1909, there had been some cutting into the northerly end of the east channel on account of a jam of logs, but there was no evidence that it was serious. About this time, the plaintiffs constructed a jetty extending out some distance across the northerly opening of the east channel. About January, 1911, the defendants, who are engaged in the logging business, were operating on the river above the point where the two channels separate, placing logs in the river and floating them down. About that time, the river again showed a tendency to cut into the east channel because of the filling of the west channel with the defendants' logs. In the summer of 1911, the plaintiffs constructed from the old jetty a boom of logs, united with heavy wire or cable, southerly across this east channel to the northerly gravel bar; and subsequently, across this low bar and across the north cross channel, to the second bar, which is designated as a high gravel bar. Still later, they constructed a similar boom from this high bar across the second cross channel to the large island. They were assisted in a part of this work by the defendants.

The evidence tends to show that, between January, 1911, and March, 1913, successive jams were formed by the defendants' logs; at first, in the west channel between the northerly gravel bar and the west bank. In November, 1912, the defendants ceased work above this point, and established a rollway for depositing logs in the river at a point on the west bank of the west channel, and on the plaintiffs' land a short distance above the north end of the large island. There was evidence that they continued depositing logs in the river at

this landing when the water was too low to carry them out, so that they formed a pile or jam in the river between the west bank and the island, and extending a long distance down the westerly side of the island. At the upper end, between the island and the west bank of the river, some of the witnesses testified that these logs were piled to a height of forty or fifty feet above the bed of the river. Photographs in evidence indicate that condition at the time of trial. The evidence fairly shows that these logs obstructed the river at this point almost continuously from November, 1912, until the trial, in June, 1913. The water was backed up in the west channel, forming a large, stagnant pond. During this period, other loggers placed their logs in the river above the plaintiffs' land and they floated down, stopping in this stagnant water, forming another large jam extending from where the old, or east channel branches off from the main, or west channel, southerly to a point opposite the high gravel bar. There was evidence, also, tending to show that this upper log jam would not have formed but for the fact that the lower jam, formed at, and south of, the defendants' rollway, had so congested the water above it as to create an eddy in which the logs belonging to other persons stopped and gradually accumulated.

In the fall of 1912 and the spring of 1913, the water, so backed up, broke through the plaintiffs' jetty and boom above described, washed through the upper opening of the east channel and the two cross channels, washed out the old filled east channel, and, being deflected against the east bank of this east channel, washed away several acres of the plaintiffs' meadow along the east bank of the old east channel; and at the time of the trial, was endangering between fifty and sixty acres of meadow and orchard land of the plaintiffs along that side. As we have said, much of the evidence tending to establish these facts was flatly contradicted by the defendants' witnesses; but, on this conflict, all of these facts were clearly questions for the jury. This is not seriously con-

troverted.  At the request of the defendants, special inter-
rogatories were submitted to the jury, and answered, as fol-
lows:

"Question:  How many acres of lands of plaintiffs do you
find has been washed away since January 1st, 1911?  An-
swer:  Nine (9).  Question:  How many acres of land of
plaintiffs do you find have been washed away by the negli-
gent or wrongful acts of defendants since January 1st, 1911?
Answer:  Seven (7).  Question:  If any, how much do you
find such land to have been reasonably worth?  Answer:  One
hundred and seventy-two and 50-100 ($172.50) per acre."

The court instructed the jury as follows:

"(1)  The burden is on the plaintiffs to establish their
case by a preponderance of the evidence.

"(2)  Defendants have abandoned their cross-complaint
whereby they claimed damage from plaintiffs; so you are not
to consider the same.

"(3)  Before plaintiffs can recover they must show by a
preponderance of the evidence that they have been damaged
by the negligent or wrongful act or acts of defendants in the
manner set forth in their complaint and for such damage so
shown if any, they are entitled to your verdict.

"(4)  As to damage to land west of the river, where de-
fendants' landing was, if you find that it belonged to plain-
tiffs and that defendants entered upon it without plaintiffs'
consent, you are instructed that under the evidence, no other
than nominal damages, say $1, could be recovered.

"(5)  Defendants had the right to use the river in its
natural state to float logs down the same, and this right
would, of course, include the right to place logs in the bed of
the stream preparatory to floating the same down; and if in
the exercise of such right defendants were guilty of no neg-
ligence; if they at all times used such care and diligence as
a reasonably cautious and prudent man would and should
have used under the circumstances, to prevent injury to
plaintiffs' property, then plaintiffs could not recover for in-
juries so sustained.

"(6)  But in the exercise of this right to put logs into,
and float them down the river, it was the duty of defendants
at all times to use reasonable care and diligence to see that

no unnecessary damage was done to plaintiffs' property, and if they failed in this, either by putting or having too many logs in the river at one time, or by failing with reasonable diligence to look after their logs and break the jams, if any, or otherwise; and by reason of such failure plaintiffs' property was damaged, then defendants would be liable.

"(7) Among other things defendants, in their answer, in effect, claim that plaintiffs, with knowledge of the manner in which defendants were conducting their operations, gave 'their assent and consent thereto,' and you are instructed that if plaintiffs, with such knowledge, did consent thereto, or did consent to any of the acts or conduct now complained of they cannot now recover for the consequences of such acts or conduct. But the mere fact, if it be a fact, that plaintiffs did not at the time, or before the commencement of this action, object to what defendants were doing would not prevent their recovery.

"(8) Defendants would not be liable for damage caused by logs put in the river or floated down by others, unless it should appear that by reason of the negligence or want of proper care on the part of defendants a condition existed without which such damage would not have occurred, and which condition was a contributing proximate cause to such damage, in which case defendants would be liable to the extent of the damage so caused by them.

"(9) You have had a view of the premises; and in arriving at your verdict, and in considering the weight to be given to the testimony of witnesses, when it may aid you, you should remember and consider what you saw on the ground.

"(10) If you find that logs of defendants being commingled with logs of other persons were negligently or wrongfully permitted by defendants to cause damage to plaintiffs in connection with such other logs, and that defendants were not responsible for the other logs being where they were or causing damage, then defendants would only be liable for such portion of such damage as was caused by their own logs.

"(11) If you find for plaintiffs, you will assess their damages in such sum as you may find from the evidence will reasonably compensate them for the injury caused by defendants' negligence or wrongful act or acts. And you should take into consideration not only damage by reason of land actually washed away, if any, but also such injury or damage,

if any, to plaintiffs' remaining lands as you may find with reasonable certainty from the evidence has been sustained. For example, if you should find that by reason of defendants' negligence or wrongful act or acts, the channel of the river has been changed; and that thereby lands of plaintiffs not yet washed away have been and are endangered, you should take this into consideration in arriving at the amount of your verdict."

The jury returned a general verdict for the plaintiffs, assessing the damages at $4,000. The defendants moved for a new trial on all of the statutory grounds. This was overruled, judgment was entered upon the verdict, and the defendants appealed.

The appellants have made some twenty-four assignments of error, which may be conveniently considered under six heads: (1) error in overruling appellants' objection to the trial of the cause by jury; (2) error in not stating in the instructions the issues in the case; (3) error in the admission of evidence as to the rainfall at Aberdeen for the months of September, 1912, to May, 1913, inclusive; (4) error in giving the sixth and eleventh instructions; (5) error in the refusal of certain instructions requested by the appellants; (6) error in overruling the motion for a new trial. We will consider these in their order.

I. On April 30, 1913, the appellants noted the cause to be set for trial. On May 1, the respondents filed a written demand for trial by jury. When the cause was called for trial on July 12, the appellants objected to calling and empaneling a jury, "for the reason that no jury fee has been paid within two days of the time the case is called for trial." On inquiry, the clerk informed the court that, at the time, the jury fee had been paid. When it was paid, nowhere appears. The objection was overruled, the jury was impaneled, the objection was renewed and again overruled. Under the original act, Laws of 1903, p. 50, we have repeatedly held that:

"It is within the discretion of the trial court to permit a demand for a jury to be made after the case is called to be set for trial, or to submit the issues of fact in a case to a jury of its own motion, and no error can be predicated upon its ruling in that regard." *Knapp v. Order of Pendo,* 36 Wash. 601, 79 Pac. 209.

See, also, *Fleming v. Wilson,* 39 Wash. 106, 80 Pac. 1104; *Hart v. Cascade Timber Co.,* 39 Wash. 279, 81 Pac. 738; *Sholin v. Skamania Boom Co.,* 56 Wash. 303, 105 Pac. 632, 28 L. R. A. (N. S.) 1053. The present law, which is amendatory of the act of 1903, was passed in 1909, and reads as follows:

"In all civil actions triable by a jury in the superior court any party to the action may, at or prior to the time the case is called to be set for trial, serve upon the opposite party or his attorney, and file with the clerk of the court a statement of himself, or attorney, that he elects to have such case tried by jury. At the time of filing such statement such party shall also deposit with the clerk of the court $12, *which deposit, in the event that the case is settled out of court prior to the time that such case is called to be heard upon trial, shall be returned to such party by such clerk.* Unless such statement is filed and such deposit made, the parties *shall* be deemed to have waived trial by jury, and consented to a trial by the court: *Provided, that, in the superior courts of counties of the first class such parties shall serve and file such statement, in manner herein provided, at any time not later than two days before the time the case is called to be set for trial.*" Rem. & Bal. Code, § 316 (P. C. 81 § 641).

The part which we italicize was added by the new act and the word "shall," which we have italicized, was substituted for the word "will." The appellants contend that the substitution of the word "shall" evidences an intention on the part of the legislature that the waiver by failure to demand a jury and pay the jury fee shall be mandatory. It is asserted that this was the real purpose of the amendment. It is clear, however, that the real and material change is the provision for the return of the fee in case of settlement. If the

legislature had intended to make the waiver mandatory and to take away the discretion which we have repeatedly held was vested in the court, it would have made that intention manifest by something more than the mere substitution of "shall" for "will." The statute does not say that the court shall not grant a jury trial, but merely the parties shall be deemed to have waived a jury. In any view of the case, the situation is covered by another section, Rem. & Bal. Code, § 318 (P. C. 81, § 553), preserving the power of the court to authorize the trial of any issue by a jury. The matter is still one within the discretion of the trial court, and we find no abuse of that discretion in this case.

II. The failure of the court to preface his instructions by a statement of the issues was, so far as the record shows, never raised as an objection in the lower court. No request was made that the charge state the issues, nor was any exception saved on this ground. The elimination of the appellants' cross-complaint, which is pointed out in the instructions as given, left the issue a simple one and the instructions as given made sufficiently clear to the jury the things in controversy. In such a case, the failure to state the issues more fully is not reversible error. *Lambert v. La Conner Trading & Transp. Co.*, 37 Wash. 113, 79 Pac. 608. This case is clearly distinguishable from *Hoffman v. Watkins*, 78 Wash. 118, 138 Pac. 664.

III. The admission of exhibits and testimony of the weather observer at Aberdeen, in relation to the rainfall there, was not error. While these lands are located some miles, and the head waters of the Wynooche a considerable distance, from Aberdeen, the evidence had some tendency to show the prevailing rainfall in all that section of the country. The appellant was at liberty to show these distances from Aberdeen, and the weight of the evidence was for the jury. On its admission, the trial judge remarked that it was admitted for what it was worth. It appears that Aberdeen was the station of the United States weather bureau

nearest to this land. Such evidence has many times been held admissible (*Anderson v. Hilker*, 38 Wash. 632, 80 Pac. 848), even where the point of observation was far distant from the point in question in the given case. *Evanston v. Gunn*, 99 U. S. 660; *Mears v. New York, N. H. & H. R. Co.*, 75 Conn. 171, 52 Atl. 610, 96 Am. St. 193, 56 L. R. A. 884; *Hart v. Walker*, 100 Mich. 406, 59 N. W. 174; *The E. T. Williams*, 139 Fed. 231; *The Sir Robert Fernie*, 96 Fed. 348; *The Queen Elizabeth*, 100 Fed. 874; *In re McWilliams*, 74 Fed. 648. Many other decisions to the same effect might be cited. The objection to the remoteness of these observations went merely to their weight as indicated by the court's remark upon their admission.

IV. It is claimed that the sixth instruction, which we have set out in full in our statement of the case, was erroneous in that it placed upon the appellants the obligation to take affirmative action to prevent damage to the respondents' property. It is argued, since the appellants had the right to place their logs in the river for the purpose of being floated down by natural freshets, that, if they were left by such freshets—that is, by the action of nature in a condition causing injury by their being in the stream—no damage could be recovered for any injury resulting from their presence. This is unsound. We have recently held, in the case of *Johnson v. Irvine Lumber Co.*, 75 Wash. 539, 135 Pac. 217, that there is a positive duty upon one using a stream for the floating of logs to use reasonable care in looking after such logs after they are placed in the river, and that, if a failure in that regard results in the formation of a log jam causing injury to riparian land by reason of such jam not being removed within a reasonable time, the owner of the logs is liable for the resulting damage. Upon a rehearing of that case, we reaffirmed that view. *Johnson v. Irvine Lumber Co.*, ante p. 520, 140 Pac. 577.

It is further objected that this instruction was erroneous, in that it stated that the appellants would be liable if they

failed in exercising reasonable care, either by putting too many logs in the river at one time, or to look after their logs and break jams, if any, or otherwise. While the use of the words "or otherwise" was apparently unnecessary, they did not render the instruction fatally indefinite as claimed by the appellants. The specification of the things which would constitute actionable negligence was so definite that the jury could not have been misled by the addition of the words "or otherwise."

The appellants argue that the right of floatage carries with it the right to put as many logs into the river as can be carried out on an ordinary freshet, the implication being that, at low water, they would have the right to jam the river with logs in the anticipation that future freshets would carry them down. The right of floatage and the rights of riparian owners upon a floatable stream are correlative. The riparian owner cannot object to a reasonable use of the stream by those entitled to the right of floatage. On the other hand, the latter have no right to overtax the capacity of the stream, either in high or low water, to the injury of the riparian owner. It is manifest that the piling of logs to a height of fifty feet in a shallow stream during low water would necessarily render an ensuing freshet extremely damaging to riparian lands. We find no serious error in this instruction.

The appellants inveigh against the eleventh instruction upon the ground that it permitted the jury to assess damages to the remaining land in addition to the value of the land actually washed away. The evidence was overwhelming that from forty to sixty acres of the remaining meadow land was rendered liable, by the change of the river bed, to total destruction by progressive erosion. One witness testified that all of this meadow land had been damaged by the change of the river bed in half of its value. As directed to this evidence, the instruction was clearly correct. As stated in their brief, "it was the theory of appellant, under the evi-

dence, that the court should have instructed the jury that the measure of damages in this case would have been the land actually taken," and that "the proper measure of damages contended by appellants was the reasonable market value of the lands actually taken." This was insisted upon throughout the trial; so much so that no instruction was requested by the appellants upon any other theory. It is now urged that the damages should be limited to $1,207.50, the value of the seven acres of land actually washed away, as found by the jury in answer to the special interrogatory. Obviously, this would not be compensation for a condition which the jury found was created by the negligence of the appellants, and which was a condition progressive in its nature and would of necessity diminish the market value of the remaining land. The court was, therefore, justified in instructing, as it did, that the jury might, in addition to the damage from actual destruction, take into consideration damages, if it found any, to the remaining land by reason of its being endangered. True, the court did not instruct that this damage should be measured by the reduced market value accasioned by such endangering, which is the correct measure, as we have held in two recent decisions. *Keil v. Grays Harbor & Puget Sound R. Co.,* 71 Wash. 163, 127 Pac. 1113; *Idaho & Western R. Co. v. Coey,* 73 Wash. 291, 131 Pac. 810. Doubtless the court would have so instructed had the request been made; but the appellants did not request any such instruction, and, so far as the record shows, did not then object to the instruction on that ground. Even now, their chief contention is directed to the failure of the trial court to confine the jury's consideration of damages to the seven acres of land actually destroyed. For the failure of the court to fully instruct on the measure of damages, it would be manifestly unjust now to order a judgment for only $1,-207.50, as counsel urges, and we think it would be equally unjust to order a new trial, at great expense to the county and to the respondents, in order to supply an instruction

which the appellant did not request, and which, under the evidence and the instructions given, could hardly have changed the result. The trial was a long and expensive one. Many witnesses testified, and the record of their evidence covers nearly 700 pages. While this instruction was not complete, in that it failed to state the measure of damages, we do not believe that substantial justice would be subserved by a reversal on that account.

V. The appellants have assigned many errors upon the refusal of the court to give certain requested instructions. We have examined these with much care, and while some of them would not have been improper, they are sufficiently covered by the instructions given. Others are based upon the theory that the appellants had the right to use the river for storage purposes for their logs until such time as the natural freshets would carry them away, and that they would not be liable for damage caused by any change of the river resulting from such a course. As we have seen, this is not the law. The appellants had no right to overtax the capacity of the river to the respondents' damage at any time. *Watkinson v. McCoy*, 23 Wash. 372, 63 Pac. 245; *Gilson v. Cascade Lum. Co.*, 54 Wash. 289, 103 Pac. 11. These cases clearly establish the rule that damages can be recovered for injuries resulting from negligence and which are not the natural results of using the stream as a highway only.

Certain other instructions requested were based upon the theory that, if the old channel had ever been a natural water course, the respondents cannot recover damages from the defendants for their act in forcing the water back to such old channel. This is not the law. The accustomed course of a stream which a riparian owner has the right to insist shall not be disturbed is not to be found in historical research, but is that which is its natural and apparently permanent course at the time when the right is called in question. 2 Farnham, Waters & Water Rights, § 489, p. 1636. There was ample evidence in this case that the old channel had been, for many

years, obstructed and filled. It was that status which the respondents had the right to insist should not be disturbed by the appellants' negligent use of the river. The court instructed the jury, in the third instruction, that the respondents could not recover unless the damage was caused by the negligence or wrongful act of the appellants.

Two of the requested instructions were to the effect that the respondents had no right, by any artificial means, to prevent the river from changing its course, by reason of either usual or extraordinary freshets, to prevent injury to their lands, and that "the forces of nature are entitled to their way without interference from abutting owners upon such water courses." This, of course, is not the law, and no authority is cited even remotely sustaining such a theory. On the contrary, it is a general rule that an owner has the right to protect his land from overflow by water from rivers, as in case of surface waters. *Hoard v. Des Moines*, 62 Iowa 326, 17 N. W. 527; *McDaniel v. Cummings*, 83 Cal. 515, 23 Pac. 795; *Harvey v. Northern Pac. R. Co.*, 63 Wash. 669, 116 Pac. 464; *Cass v. Dicks*, 14 Wash. 75, 44 Pac. 113, 53 Am. St. 859. This is certainly true so long as he does not so deflect the current of the stream as to injure other riparian proprietors. 3 Farnham, Waters & Water Rights, 880a. Any other view would wantonly sacrifice many valuable riparian lands without a possibility of benefit to any one. The exigencies of this case do not warrant the announcement of a rule so dangerous and far reaching.

Other instructions were requested embodying the theory that the respondents had no right to place any protection work in the old bed of the river to protect their lands, and that, if any logs belonging to the appellants caused injury to the plaintiffs' land by jamming against the protection work placed by the respondents, there could be no recovery for such damage. These instructions were properly refused for two reasons. In the first place, the assumption that the

respondents had no right to protect their lands was incorrect. Moreover, the protection was put in with the knowledge, consent and assistance of the appellants. They knew this protection work had been placed there, and knew its purpose. In the second place, the evidence showed, and both parties admitted at the trial, that the logs which formed the jam opposite the respondents' protection works were logs belonging to persons other than the appellants. The court, in its eighth instruction, told the jury that the appellants would not be liable for any damage caused by logs put in the river or floated down by others unless it appeared that by reason of negligence or want of proper care on the appellants' part a condition existed without which such damage would not have occurred. This fairly covered the only part of the requested instructions which would have been proper in any event. While it would have been proper to tell the jury that the respondents could not recover for any diversion of the stream caused by their own obstructions, that was clearly implied by the instructions given, and as we have seen, it would have been positive error to instruct that the respondents had no right to place any protection works across the old channels to save their own land. The court also instructed that the appellants had the right to use the river in its natural state, and would only be liable for the negligent exercise of that right. We think the instructions given sufficiently covered the law as applicable to the evidence.

The only other requested instruction which we deem it necessary to notice was to the effect that, if the jury found the respondents entitled to any damages, they were entitled to recover the reasonable market value of the lands actually destroyed by the errosion. This was, as we have seen, properly refused, since it ignored and impliedly denied the right to recover for the damages reasonably certain to result by the endangering of the respondents' remaining lands.

VI.   The evidence was sufficient to sustain the amount of the verdict as returned.   The instructions, though not free from fault in their failure to sufficiently state the measure of damages, clearly covered every other phase of the law of the case.   That fault was not prejudicial, in view of the fact that the special interrogatories advised the jury that market value was the criterion.   Moreover, as hereinbefore pointed out, the appellants did not request a proper instruction covering this point.   We find no error which would justify us in saying that the court abused its discretion in denying a new trial.

The judgment is affirmed.

CROW, C. J., MAIN, CHADWICK, and GOSE, JJ., concur.