[No. 343. Decided May 11, 1892.]

CHARLES H. SPINNING, A. J. FROST, *et al.*, *Respondents*, v. BERTIE SHERMAN DRAKE, J. C. DRAKE AND EDWARD HUGGINS, *Appellants.*

CONTRACT TO CONVEY LAND—RESCISSION.

The fact that a vendee under an executory contract for the sale of certain land, which has been delayed in execution on account of defects in title, offers to withdraw from the contract upon the immediate repayment of a sum of money advanced thereon, does not amount to a rescission when the vendor does not accept the offer as made, and the vendee thereafter by his acts shows an election to stand by the contract.

An executory contract for the sale of real estate, made in compli-
ance with the statute of frauds, cannot be rescinded by an oral execu-
tory agreement therefor, unless something is done in performance of,
or pursuant to, the agreement to rescind, which tends either to put-
ting it into execution by the parties or has the effect of working an
estoppel as to one of them.

Where a grantee accepts a deed to land and goes into possession
thereunder, he is estopped to dispute his grantor's title as against the
latter's demand for the purchase money.

### *Appeal from Superior Court, Pierce County.*

Action by Charles H. Spinning, Mildred D. Spinning,
A. J. Frost and Mary Frost against Bertie Sherman Drake,
J. C. Drake and Edward Huggins to restrain the recording
of a certain deed, and for its cancellation, and the quiet-
ing of plaintiffs' title.     Complaints in intervention were
filed by Emma and Frank F. Gray, and by Edward P.
Cadwell and Galusha Parsons.     Trial by the court, and
decree rendered in favor of plaintiffs and intervenors Gray
and wife.

*Galusha Parsons*, for appellants.

*Thomas Carroll*, and *Doolittle, Pritchard, Stevens & Gross-
cup*, for respondents.

The opinion of the court was delivered by

Stiles, J.—August 1, 1889, respondents Spinning and
Frost, executed and delivered to appellant Drake their
contract in writing for the conveyance of a certain acre of
land in Pierce county described as follows: "Commenc-
ing at a point 48 rods E. of the N. W. corner of the N. E.
quarter of Sec. 31, T. 21 N., R. 3 E., W. M.; thence S. 20
rods; thence W. 8 rods; thence N. 20 rods; thence E. 8
rods to the place of beginning."     The consideration was
$6,000, of which $1,000 was paid at or before the delivery
of the contract, $1,000 more was to be paid in sixty days
from August 1, 1889, and upon the payment of that sum

the grantors were to execute and deliver a warranty deed for the land, and the grantees were to execute and deliver a mortgage for the balance of the purchase money with two notes, one of which for $1,000 was to be payable ninety days from August 1, 1889, and the other for $3,000 in one year from the same date. The whole of the unpaid purchase money was to bear interest at ten per cent. per annum from August 1, 1889. Conversations between the parties resulted in a proposition on the part of the Drakes that they would pay the second and third sums of $1,000 each earlier than the contract provided, so that preparations were made for completion of the transaction September 12th. On that date the parties met, the grantors having prepared and executed ready for delivery their proper deed of warranty to the grantees. An unsigned mortgage was also ready. An abstract of the title was then presented which the grantors proposed as a correct representation of the title, from which, upon its examination by counsel for the grantees, certain imperfections in the title were found to exist, which by agreement of all parties caused a postponement of the matter until the alleged deficiencies could be corrected. The grantors undertook to procure such papers as counsel pronounced necessary to perfect the title, and proceeded to do so. To facilitate the business the abstract and other papers present at the interview were deposited with counsel and so remained for some time. Some of the objections to the title were from time to time obviated by the procurement of a tax receipt, the satisfaction of a mortgage, etc. On the 18th of September respondent Charles H. Spinning went to the residence of the Drakes in Tacoma, and handed to Mrs. Drake a package, saying, "Here are your papers, everything is all right now." She took them but did not look at them until he had gone. Then she found among them the deed for the land. She consulted counsel,

telling him of the deed, and was advised that certain title defects which he regarded as material were not yet obviated, and she was further advised to return the deed, as it might be claimed that she had accepted it and waived the uncured defects.    But no offer to return the deed was made, and nothing was said about it until nearly a month later.

Mr. Spinning maintained, and we believe, with truth, that when he handed the package of papers to Mrs. Drake September 18th he did not know that the deed was in it, and did not intend to make delivery of the deed for any purpose.    We think, with the court below, that in his anxiety to show Mrs. Drake that he was getting on in arranging the title he took her certain papers which pertained to it, and in handing them to her inadvertently gave her the deed also.    This we should not construe to have been a delivery, and were this all of the case it might end here with an affirmance.    But misunderstandings took place between the parties.    The Drakes claimed to have had a survey of the land made, which showed that a certain street of the city of Tacoma, if prolonged, would cut forty-three feet in width off the east side of the acre, which was contrary to statements made to them before they entered into the contract.    Thereupon Spinning and Frost offered, if that should turn out to be the case, to set the acre over forty-three feet to the west upon another acre which they owned, so that they having "bought an acre should have an acre."    When this talk was had Mrs. Drake produced the papers, including the deed, and offered to return them all, and give up her purchase, upon re-payment of her $1,000.    She says in making this offer she twice mentioned the deed, and exhibited it in her hand. The others did not hear the reference or see the deed. Which side is correct is material only as tending to show knowledge on the part of the respondents that appellants were then, in some way, in possession of the deed, from

which a delivery by assent might be argued. The result of the controversy over the street was that if the Drakes could have a full acre in the event of the street taking off a part of the acre contracted for, and a perfect title, they were content to proceed under the contract, but if not then they proposed to rescind or receive back the money they had paid. Respondents claim, however, that there was no alternative, but that it was agreed orally that the contract was off, and that as soon as they paid the $1,000 the whole matter was to be ended. The culmination of all this negotiation occurred about October 11, 1889. Each party acted upon their own understanding of the condition of things. Spinning and Frost having used the money paid them in August set about their most feasible method of raising it and made a new contract of sale with intervenors Gray; while the Drakes, supposing they would get the land, made a sub-contract with intervenors Cadwell and Parsons.

On October 24th, Drake and Cadwell visited Spinning for the purpose of getting assurance from him that the forty-three feet would be secured by "setting over." He then said Frost had informed him that he had sold both acres to Gray. Drake informed him then that he and his wife wished to go on with the purchase if the title could be made good. On October 26th, Frost for himself and as agent for Spinning gave Gray an option on ten acres for three days for a nominal consideration. On October 28th the Drakes, believing that some advantage was about to be taken of them, through a contract or conveyance to be made with Gray and wife, deposited the deed in their possession with the auditor, for record, and took possession of the land which was then an unoccupied, vacant tract, and put a fence around it. On the 29th, a contract for the sale of the land between the Spinnings and Frosts and the Grays was executed and filed for record in the auditor's office.

·On the 30th, Spinning and Frost tendered to the Drakes
·their $1,000, paid August 1st, and on the same day com-
menced this action to restrain the auditor from spreading
·the deed upon the records of the county, and to procure its
·cancellation as a conveyance. Fraud and mistake in the
procurement of the deed without delivery was the basis of
·the suit.

*In limine*, we desire to say that while no one appears for
·the auditor on this appeal, and the disposal of the case will
not involve a determination of the question whether the
·action was maintainable against him, we do not wish it un-
derstood that we consider it matter of course that such an
action could be maintained. He demurred to the com-
plaint, but although the decree went against him, his de-
murrer was never disposed of, and we shall leave the subject
open for future adjudication. The case is different from
that of *Paxton v. Danforth's Admr.*, 1 Wash. 120, in which
case the auditor was not in any manner attacked, and the
deed had a peculiar value.

The material point in this case is whether an executory
contract for the sale of real estate, made in compliance
with the statute of frauds can be rescinded by an oral
·executory agreement to rescind. There is no doubt that
·such a contract may be rescinded by the act of the parties,
without any writing whatever, but in order that a court of
equity may be moved to treat such a contract as already
rescinded by the act of the parties, there must have been
·in the first place a certain agreement to rescind, and, sec-
·ondly, something done in pursuance of it either by putting
·the agreement into writing, or by one of the parties, to the
knowledge of the other, taking action in reference to the
property which will be to his disadvantage unless the rescis-
·sion be carried out. The titles to real estate are held to
.be of too high importance to permit their being allowed to
·depend upon mere parol agreement. Respondents' claim

is, that the Drakes were dissatisfied with the title and the doubt about the forty-three feet, and abandoned the contract upon promise of being repaid their $1,000 in a reasonable time. They unquestionably did offer to abandon upon immediate repayment, and if their offer had been accepted there would have been no case. But it was not accepted, and the Spinnings and Frosts had notice five days before they contracted with the Grays, and before they were in anywise bound to them, that the Drakes were still proposing to proceed under their contract, and had not abandoned it. The Grays had notice of the existence of the Drake contract and of its continuance, and they knew that the $1,000 which they paid was to be used to repay the Drakes, that is, to procure a rescission which had not yet taken place. The Drakes were not standing upon any mere technical objections to the title, since, if the abstract were to be taken as expressing the real title of Spinning and Frost, there were some very substantial defects in it; and had they stood out upon their rights under the contract, they would have been entitled to take such conveyance as their grantors could make, with a just abatement for the actual deficiency. They were not obliged to move further in the matter until a perfect title was tendered them. A purchaser of real estate who is, under his contract, entitled to a good title, need not pay the purchase money until he gets the title guaranteed to him. If he decline to receive a deed and pay purchase money, alleging defect of title, on grounds plausible enough to cause a prudent man to hesitate, though turning out to constitute no defect, this will not defeat his right to specific performance. Waterman, Specific Perf., § 419; *Watson v. Coast*, 35 W. Va. 463; *Clark v. Gordon*, 35 W. Va. 735. So, mere hesitation to accept a deed and demand for a perfection of title cannot be taken as abandonment of the contract. This is the most we

find in the evidence on the part of the Drakes; while as between them and their grantors and persons with notice, they might have gone much further and still been saved from a forfeiture by abandonment. The effect of the decision of the superior court was to put them entirely in the wrong, whereas the other party was in the wrong from the beginning in contracting to sell a good, unencumbered title where none existed in them so far as this case develops. In equity it is very probable that this may be a good title, but the contract was for the entire title, both legal and equitable, and on the face of the record it does not appear to be either.

Respondents cite Warvelle on Vendors, page 833, *et seq*. This authority recognizes the right of parties to a contract for the sale of land to make a voluntary rescission of their contract by a mere parol agreement. Sec. 2, p. 834, says:

"It has been held in some of the earlier cases that an agreement to rescind is as much an agreement concerning land as the original contract, and hence should be in writing; but all the later cases, both in England and the United States, are unanimous in affirming that a contract in writing, and by law required to be in writing, may in equity be rescinded by parol; and this even though the contract may have been under seal. Such rescission may be effected not only by an express agreement, but by any course of conduct clearly indicating a mutual assent to the termination or abandonment of the contract. It may consist either of words or acts, and all the circumstances attending the transaction may be shown to prove intention; but if evidenced by acts alone, they must be such as leave no doubt as to such intention."

It must be remembered that the author in this part of his book is speaking of rescissions generally, not only of contracts for the sale of land, but of every kind of contract, whether necessary to be in writing or not; and to illustrate what the author means to say when he states that

a contract which is required by law to be in writing may in equity be rescinded by parol, it is only necessary to refer to some of the cases which he cites, and which are also mentioned and relied upon in respondent's brief. *Lauer v. Lee*, 42 Pa. St. 165, was a case where one brought ejectment on his legal title against a defendant in possession, who alleged a parol contract for the purchase of the land, possession, and part payment of the purchase money. In the course of the opinion, the court said:

"It has been settled that an executory contract for land may be rescinded by parol; *Goucher v. Martin*, 9 Watts., 106; *Boyce v. McCulloch*, 3 W. & S. 429 (39 Am. Dec. 35)- But it must be evidenced by *acts* accompanying the rescissio n which leave no doubt of the intent, such as cancel ing of the agreement or removing from the possession, when the contract rests only in parol."

In *Low v. Treadwell*, 12 Me. 441, the court said that the parties might vary a written contract by a subsequent parol agreement; they might enlarge the time of payment or change the mode of payment, or put an end to the contract; and this might be proved by parol, and equity would give force to the arrangement; but speaking of *Brooks v. Wheelock*, 11 Pick. 439, the opinion said:

"To us, the point decided in that case appears to be altogether different from the one under consideration. Wheelock entered into a contract in writing, to execute and deliver a deed of land upon payment of certain notes given for the purchase money, and made a subsequent verbal promise to deliver the deed upon the payment of the notes before they should fall due. Payment of the notes was tendered before they became payable, but the tender was refused, and the notes were not actually paid. The court held the tender of no effect, as the defendant was not bound by his written contract to receive payment before the notes fell due. If the payment had been received, the specific performance would, no doubt, have been decreed."

*Murray v. Harway,* 56 N. Y. 337, is a case wherein it was held that an agreement for the renewal of a lease of lands would not be held waived unless the circumstances showed an intention of the parties that there should be an absolute abandonment and dissolution of the contract. Speaking of the finding of the court below that there had been a rescission of the agreement between the parties, the court said:

"A treaty and negotiation for a variation of an agreement will not amount to a waiver of it unless the circumstances show an intention of the party that there should be an absolute abandonment and dissolution of the contract. (*Robinson v. Page,* 3 Russ. 114.) The circumstances here, show a willingness to meet the wishes and objections of the plaintiff, but not a purpose to release him from his obligation if it could not be done. We find no evidence to sustain the referee's finding, that after the failure to obtain the consent, and after the refusal of the plaintiff to perform, the defendant on his part abandoned and rescinded the contract. The fact that the defendant resumed possession of the subject-matter of the contract is thought to have a bearing upon this point. This was not done, however, until after the plaintiff and his co-partners had abandoned the premises and given up the care of a large personal chattel property. The defendant took possession and charge of it for its preservation, and to prevent loss and damage. This act cannot be evidence of a surrender of the contract and of his right under it when viewed in connection with his letter asserting his adherence to it, and his demand upon the plaintiff."

In *Dial v. Crain,* 10 Tex. 444, the court said:

"The judge did not err in refusing to give the charge as it was asked. It assumes that the contract for the sale of the land from Vaughn, the plaintiff's intestate, was a parol contract. A reference to the statement of facts will show that this contract was a writing signed by Vaughn. . . .

"This was a good and valid contract under the statute of frauds, and was proof that the land was sold by Vaughn to Crain. If, then, Crain being the owner of the land, any

contract for a rescission would be as much obnoxious to the provisions of the statute of frauds, and would require the same evidence under the statute to set it up, as was required for the sale from Vaughn to Crain. The charge asked treated the contract between Vaughn and Crain, evidenced by the writing signed by Vaughn, as a mere verbal contract, and such as could be rescinded verbally, without any reference to the provisions of the statute of frauds, and as if for that purpose inferior evidence could be received. This will be the most apparent by a reference to the statement of facts, which shows that the plaintiff to prove rescission depended mainly upon the acts and declarations of Vaughn and some light remark from Crain. But there was no evidence of the payment of the money by Vaughn, nor of his again going into possession and claiming it as his own."

*Snodgrass v. Parks*, 79 Cal. 55. This was a case in which the vendor sought to quiet title against the purchaser from his vendee under a contract to sell; the vendee had entirely failed to comply with the contract in any respect, and, the court found, had wholly abandoned it, and had taken possession of the property as the tenant of the vendor. *Boyce v. McCulloch*, 3 Watts & S. 429 (39 Am. Dec. 35), is relied upon by the intervenors Gray. That was an action in ejectment, which in the state of Pennsylvania is equivalent to a bill for specific performance. Boyce brought his action to require the conveyance of land which had been contracted to him in 1829 by one Loyd, who was the grantor by several *mesne* conveyances from defendant McCulloch. It was claimed by the defendants that the plaintiff and Loyd had agreed to rescind the contract by a parol agreement in 1829, shortly after it was made. The main discussion in the case was whether, there having been what the defendants' grantor construed to be a parol agreement to rescind between the grantor and the grantee, the plaintiff in an action for specific performance could avail himself of the rule that

an executory agreement in writing under the statute of frauds could not be rescinded except by an agreement of the same formality.   The court said:

"No doubt, if evidence had been given, showing that the articles of agreement had been canceled, or actually given up for that purpose, or such possession as Boyce had, had been surrendered, in pursuance of the agreement to rescind the articles, it would have made the case perfectly clear for the defendants; because it might have been considered, even at law, as amounting to an actual rescission of the agreement contained in the articles.   Though less than that might not strictly be sufficient to prevent a recovery in a personal action for a non-fulfillment of the articles, yet less may be quite sufficient in equity to prevent a specific performance thereof.   .   .   .   They (the defendants) purchased the land of Loyd without any notice of Boyce's agreement for the purchase of it, either actual or constructive.   For it appears in the first place by the evidence that they purchased, paid their money, and received a deed of conveyance for the land fourteen months before Boyce put his agreement upon record, so that they could not have had constructive notice from this source. Again, it would seem from the evidence that Boyce had not such a possession of the land as would be equivalent to notice."

Measured by any of these cases the deficiencies of this one appear, and show that there was no such meeting of minds as would serve either to make a contract or to rescind one against the wish of the grantee.   But, although the Drakes were in the right in maintaining that no abandonment or effectual agreement to rescind could be set up against them, and might have stood upon their rights under the contract, when they accepted the deed, placed it on record, and went into possession of the land, they executed the contract, and placed themselves in a position where they are estopped to say that their grantors did not have title as against their demand for purchase money.   Bigelow on Estoppel (2d ed.), 294.   Having notice of all the infirm-

ities of the title disclosed in the abstract, they must be considered to have elected to take such title as their grantors had, and to rely upon their warranty for their future protection in the enjoyment of an unencumbered fee. Force is added to this view when it is considered that the theory upon which appellants chose to stand in their pleadings was that the deed was accepted when it was handed to Mrs. Drake by Spinning. They were claiming to be rightfully in possession of the land by a properly delivered deed of warranty, over against which they admit their liability to pay the balance of purchase money, and that their grantors were entitled to a lien on the property for such balance. What the amount of such a lien should be we are unable to determine in the condition of this case, as it may depend on questions of law and fact, which were not presented by either side. Therefore, whether the deed was actually delivered, either by the voluntary act of the grantors or by their acquiescence in its retention, or if it was never lawfully delivered at all, can make no difference as affecting the respondents. They were under bond to execute just such a deed, and to give possession of the land upon payment of the purchase price. In equity upon execution of the contract for a valuable consideration the ownership of the property had already passed from them, and they were merely the holders of the legal title and their vendor's lien. Pom. Eq. Jur., §§ 105, 368, 372. It would now be a useless thing to decree the cancellation of the deed when the next step in the litigation would be to decree the execution and delivery of a new one. The vendor's lien for purchase money exists, and whenever they make demand therefor it must be paid, or the property sold to satisfy it.

A great deal was said in the case about the absorption of forty-three feet by the extension of a street, and it is agreed that the grantors stated that if the street should be

extended and the forty-three feet taken, they would make good the loss by setting over the acre the same number of feet to the west, thus securing to the purchasers a permanent acre. But the evidence does not seem to prove anything more than that it was rumored that such a street might be opened by condemnation at some indefinite time. The precise acre described in the contract was the acre to be conveyed for the consideration named; if any other land was to be subjected to the dominion of the appellants it should either have been included in the original instrument or the contingency should be shown to have happened requiring its appropriation in justice to the grantees. Moreover, the grantees having accepted the deed, we think they should be left to such legal remedies as will be theirs by right when they show actual injury under what seems to have been a mere representation as to the location of their acre on the ground, which may or may not be material.

The judgment of the superior court must be reversed, and the title established in the appellant, Bertie Sherman Drake, subject to the lien of Frost and Spinning for the balance of their purchase money and the contract of the Drakes, with intervenors Cadwell and Parsons.

ANDERS, C. J., and HOYT and SCOTT, JJ., concur.

DUNBAR, J., not sitting.

## ON PETITION FOR REHEARING.

STILES, J.—A strong appeal has been made to us in a petition for rehearing filed by respondents Spinning and Frost that we foreclose their lien for purchase money, or decree a rescission of the contract after the appellants have been allowed a reasonable time to pay the balance of purchase money, and upon their failure to so pay.

The superior court might, perhaps, have done this upon additional evidence which it might have called upon the

parties to produce.    But, as was stated in the opinion heretofore filed, this court cannot do it in the condition of the record before it.    The case was brought and tried upon two theories—first, that a contract for the sale of land must be in form a deed; second, that no delivery of the deed had been made.    The evidence showed that a modification of the contract had been agreed to, so that the second $1,000 was not to be paid, or the mortgage given until the title should be made clear.    The contract also provided that the third $1,000 should be due in ninety days from August 1, 1889, but no time was fixed for the maturity of the note to be given for the balance of $3,000, to be secured by mortgage.    The record is barren of any evidence which would enable us to adjust these matters, and particularly in view of the fact that while it appears that Mrs. Drake did take possession of the land, it also appears that respondent Frost, within a few days thereafter, retook the possession, and retained it for a time which is entirely indefinite.    For these reasons the petition is denied.

ANDERS, C. J., and HOYT and SCOTT, JJ., concur.
DUNBAR, J., not sitting.