[No. 15878. Department One. August 18, 1920.]

# D. A. CLEMENTS et al., Respondents, v. W. W. COOK et al., Appellants.[1]

FRAUDS, STATUTE OF (44)—OPERATION OF STATUTE—MODIFICATION OF CONTRACT. Upon a vendor's refusal to deliver logs under a written contract, because of default in the payments, an oral agreement to continue deliveries if the purchaser would furnish security, which was done, is not objectionable as an oral agreement to modify the contract within the statute of frauds.

SAME (44, 60)—MODIFICATION OF CONTRACT—INSTRUCTIONS. Upon an issue as to an oral modification of a written contract, required by statute to be in writing, it is not error to fail to instruct the jury that the proof must show a written modification or be of the clearest and most satisfactory kind; since it is for the court to first determine whether there is positive, definite and unambiguous testimony of the modification sufficient to sustain the burden of proof, and if so, to submit it to the jury to determine whether it preponderates over evidence to the contrary.

SAME (44)—MODIFICATION OF WRITTEN CONTRACT. A contract required by statute to be in writing may be modified by an executed oral agreement.

APPEAL (449)—REVIEW—HARMLESS ERROR. In an action for breach of contract to deliver logs, the admission of evidence to show how much the buyer had paid on the purchase price of a mill taken from him on his default under a conditional sale contract, is harmless error, since it was a merely incidental and collateral matter and must have been so regarded by the jury.

SALES (77)—FAILURE TO DELIVER—JUSTIFICATION FOR BREACH. A seller cannot justify his refusal to deliver any more logs after receiving payment on the contract, on the ground that the buyer lost the mill soon afterwards through default under a conditional sale contract, thus leaving him in no position to perform, since if the seller had resumed delivery of logs, the owners of the mill might not have elected to forfeit the conditional sale contract.

EVIDENCE (16, 18)—JUDICIAL NOTICE. The court will take judicial notice of the prices fixed for timber by the war industry board during the time the Federal government had control of the logging industry in the state, and of the fact that there was a steady and increasing

[1] Reported in 191 Pac. 874.

demand for all kinds of milling logs after the Federal government released control.

DAMAGES (77)—MEASURE OF DAMAGES—BREACH OF CONTRACT TO DELIVER LOGS. In an action for breach of contract to deliver logs in certain installments each month, covering a period of eight months after breach of the contract, an instruction fixing the measure of damages as the difference between the contract prices and the market prices at the date of breach of the contract, plus the reasonable cost of transporting other timber to the mill, is not prejudicial to the defendant, where the court could take judicial notice that the price of logs had increased during the period in question since the breach of the contract.

Appeal from a judgment of the superior court for Snohomish county, Bell, J., entered December 6, 1919, upon the verdict of a jury rendered in favor of the plaintiffs, in an action on contract. Affirmed.

*Cooley, Horan & Mulvihill,* for appellants.

*J. Speed Smith, Henry Elliott, Jr.,* and *Kerr &. McCord,* for respondents.

HOLCOMB, C. J.—In an action brought to recover $16,000 damages for the alleged breach of a contract to deliver logs, plaintiffs recovered a verdict and judgment thereon for $5,000, and defendants appeal.

There was a written contract entered into by the parties on December 19, 1920, and certain of its provisions with which we are here concerned are as follows:

"This memorandum of agreement, made and entered into by and between W. W. Cook, first party, and D. A. Clements, second party; witnesseth, that the first party agrees to log all of the merchantable timber now standing, lying or fallen on the S. W. quarter of the N. E. quarter; the N. W. quarter of the S. E. quarter, the N. E. quarter of the S. W. quarter and the E. half of the N. W. quarter, all in section 10, twp. 27, N. of Rg. 6 E. W. M., in Snohomish county, Washington, and to sell the said logs when so logged from said

land to the said second party, delivering the same to the party of the second part at his mill situated on the S. W. quarter of the N. E. quarter of said section, in the manner and at the time, and upon the terms hereinafter set out, that is to say:

"The first party agrees to proceed diligently to log, and the second party agrees to proceed to operate said mill at the earliest practical time and to continue with all due diligence until the entire contract shall have been fulfilled, provided, however, that first party agrees to deliver at the place herein stipulated, and second party agrees to accept and pay for, at least three hundred thousand (300,000) feet of logs during each and every month, beginning with the month of January, A. D. 1918.

"The price to be paid for said logs shall be as follows, viz: For all fir, $9.50 per thousand feet; for all cedar, $12 per thousand feet; for all spruce, $9.50 per thousand feet; and for all hemlock, $8 per thousand feet.

"On the first day of each month second party shall pay first party for fifty per cent (50%), as nearly as can be readily ascertained or estimated, of the price of all logs delivered during the previous month, and on or before the tenth of the month shall render a statement of the logs delivered during the previous month and pay for any and all of such logs so delivered and not already paid for. . . .

"Time is the essence of this contract and of each and every part thereof, and in case of the second party failing to comply with the terms and all of the terms thereof, first party shall have the right and option to forthwith cancel the same and each and every part thereof upon giving three days' written notice and such notice and terms so specified therein shall have not been complied within said three days from the service of such notice upon second party. In case said second party shall absent himself so that it is not practical to serve such notice on him personally, then and in that case such notice may be served on any bookkeeper or managing agent in charge, or be served

in the manner provided for the service of summons in civil actions.''

On the day following the execution of this contract, respondent, under a conditional sale agreement, acquired from the owners, John Johnson and W. S. Keller, the mill referred to in the logging contract. Thereupon appellant commenced delivering logs under the contract and respondent began to operate the mill. It appears from the record that, almost from the start, respondent experienced difficulty in promptly meeting payments, as they fell due, for the logs delivered by appellant; and on July 15, 1918, when respondent was delinquent in his payments to the amount of $1,341.48, appellant refused to make further deliveries of logs, but suggested to respondent that if he (respondent) would furnish security for the payments on his contract, appellant would thereby be induced to carry out his part of the agreement. Thereupon the following agreement was entered into by W. S. Keller and his wife:

"This agreement, made this 15th day of July, 1918,

"Witnesseth, That whereas, on December 20th, 1917, D. A. Clements, doing business as the Clements Lumber Company, made and executed a contract with W. W. Cook to purchase from said Cook logs at the mill of said Clements Lumber Company and to pay for said logs as delivered on the 1st and 10th days of each month, and certain payments are due and the said Cook refuses to deliver more logs until the payments are guaranteed.

"Now, therefore, the undersigned W. S. Keller and Eula Keller, his wife, for a valuable consideration, do hereby agree and guarantee to make all payments provided for in said contract for the purchase of the logs therein sold, or any logs sold pursuant thereto or in any manner, up to and not exceeding the sum of thirty-five hundred dollars ($3,500), by the said W. W. Cook

to the said D. A. Clements or the Clements Lumber Company, as provided for in said contract, or at all.

"And upon the failure of the said D. A. Clements or the Clements Lumber Company to make payments promptly as provided for in said contract, the said parties hereto agree to pay all of said sums promptly upon demand, up to and not exceeding the sum of thirty-five hundred dollars ($3,500) as aforesaid.

"It being understood that there is now due on said contract the sum of $1,341.48, which became due on the 10th day of July, 1918, and it is agreed that said past due payment may be made on or before the 25th day of July, 1918, and if such payment is not made, then this guaranty shall apply thereto. . . ."

Later, respondent also delivered to appellant, as further security, two promissory notes of $500 each, made payable to him by the Specialty Lumber Company. Appellant then resumed deliveries of logs, and continued to make deliveries until about the 10th or 12th day of August, when, respondent being again in default in his payments, appellant refused to deliver any more logs. At this time there was due appellant $800 for logs delivered prior to the 1st day of August. Between August 1st and 10th, $354.10 worth of logs were delivered. Appellant claims that the total amount of $1,154.10 was due and payable on August 10, but respondent insists that, under the terms of the contract, only $800 was due and payable on August 10, the remaining $354.10 not being payable under the contract until the 1st of the following month, September. At any rate, appellant would not deliver any more logs until the $1,154.10 was paid, and respondent said he would go to Seattle and try to get the money. He went to Seattle for this purpose on August 15. During his absence from the mill, appellant caused to be left there with one of the laborers, a notice in the following words:

"To D. A. Clements: You will please take notice that the payment in the amount of $1,154.10 is past due and unpaid, under the contract made between you and the undersigned, under date of December 19th, 1917. You are hereby notified that unless said amount is paid within three (3) days of the date of the service of this notice upon you, that the undersigned will cancel said contract and declare all rights thereunder forfeited. This notice is given to you pursuant to said contract, and upon your failure to comply with this notice the undersigned will consider said contract forfeited and cancelled as provided therein.

"Dated this 15th day of August, A. D. 1918.

"W. W. Cook."

Respondent paid appellant the $1,154.10 on August 21, and, according to the testimony of respondent, appellant said he would go to Monroe, get his crew together and start logging on the following morning. He did not do this, however, nor were any more logs delivered under the contract. On or about August 23, respondent having failed to make the payments due by the terms of the conditional sale agreement under which he purchased the mill, the vendors forfeited his rights thereto and took it back. Thereafter respondent brought this action for damages for the failure of appellant to deliver logs under the contract.

Much of the argument of counsel for appellant is in support of the contention that the original written contract for the delivery of logs could not be modified by the subsequent parol agreement just prior to July 15, 1918, when appellant is alleged to have promised that, if respondent would furnish security guaranteeing him payment for his logs, he would not forfeit the contract until any sum of money due him should exceed the amount of the security; and also the contention that the original contract could not be reinstated by appellant under an oral agreement on August 21, when it

had already been (as appellant claims) canceled by the notice of August 15. We are convinced, however, that a determination of the question first presented will be decisive of the latter.

As to the steps leading up to the execution of the agreement by Keller and wife guaranteeing to Cook payment up to $3,500 for logs delivered to Clements, Cook testified:

"I made a proposal to him that if he put up security for the payments on this contract—I think put up security—it would induce me to carry out the contract."

And respondent testified:

"He [appellant] said if we could furnish security so that he would be sure to get his money that he would not default his contract up to the amount of the security."

After the conversation with appellant, respondent went to Keller and told him that appellant "was willing to let the contract run behind if he had security for the payment of the logs;" and Keller then agreed to guarantee payment for the logs up to $3,500. Appellant, respondent and Keller then went to the office of an attorney, where the guaranty was drawn up and signed. Appellant objected to the testimony that went to prove the oral agreement which led to respondent's procuring the guaranty, but for the purpose for which this evidence was offered it was allowable. At the time the guaranty was executed, appellant had just refused to make further deliveries under the log contract because respondent had failed to promptly pay for the logs delivered in accordance with the terms thereof; but appellant was willing to go on with his part of the contract if he had some assurance that he would get his money. He suggested as much to re-

spondent; and, acting upon his suggestion, respondent procured the guaranty from Keller and wife.

This is no more than an agreement of further performance of an unexecuted contract, of which time is the essence, with further assurance and guaranty on the one part, and a forbearance, for a consideration, to enforce the contract rights upon the default of the party bound thereby at the expiration of the time limit, on the other part.

Appellant contends that the court also erred in submitting the case to the jury under an instruction to the effect that the jury must find by a fair preponderance of the evidence that the contract in writing had been modified or its provisions waived, and that they were entitled to have this issue submitted to the jury under instructions that the degree of proof required in showing such a waiver of a provision of a written contract should also be evidenced by writings, or of proofs of the clearest and most satisfactory kind; citing *Brown v. Winehill,* 3 Wash. 524, 28 Pac. 1037. The general rule in this state, in civil cases, is that the burden of proof must be sustained by a fair preponderance of the evidence, and what is a fair preponderance of the evidence in a law case tried by a jury is for the jury to determine. Of course, it is true that, in order to prove a modification or a waiver of a contract required by law to be in writing, the proof should show modification or waiver by writings, or by clear and convincing evidence, or, as was said in the case cited, proof of the most satisfactory kind. But this means no more than that the evidence introduced to show a waiver or a modification of the writing should be certain, positive, unambiguous and definite in its terms, rather than the contrary; or, in other words, it means quality of evidence, rather than that

it should be written, or overwhelming in quantity. It is first a question for the court to determine whether there is positive, definite and unambiguous evidence as to the waiver or modification of the written contract tending to sustain the burden of proof required therefor; and, if there is such evidence, it is the duty of the court to submit the case to the jury, the jury to determine whether it preponderates over evidence to the contrary. That is all that has ever been required of trial courts in equity cases tried by the court alone where evidence of a clear, cogent and convincing character is required to abrogate a contract for fraud, and like cases.

On the question now before us, this court used the following language in the case of *Gerard-Fillio Co. v. McNair*, 68 Wash. 321, 123 Pac. 462:

"The second question, whether the verbal contract modifying the original written contract was within the statute of frauds, is of more difficulty. . . . And this court has held that a contract modifying or abrogating a prior written contract required by statute to be in writing must itself be in writing to be obligatory. *Spinning v. Drake*, 4 Wash. 285, 30 Pac. 82, 31 Pac. 319; *Thill v. Johnston*, 60 Wash. 393, 111 Pac. 225. . . . These principles are relied upon to support the judgment of the trial court; but it seems to us that they do not meet the question presented. While it is the rule that a written executory agreement to sell or purchase real estate cannot be rescinded or abrogated by an oral executory agreement to rescind or abrogate, it does not follow that such an agreement cannot be modified or abrogated by an executed oral agreement. On the contrary, it is recognized by our own cases above cited, and it is the rule of all the cases in so far as we are advised, that an executed oral contract to modify or abrogate a written contract, required by statute to be in writing, can be successfully pleaded as a defense to an action on the original

contract.  To hold otherwise is to make the statute of frauds an instrument of fraud; for it would be fraud to allow a person to enforce a contract which he had agreed on sufficient consideration to modify or abrogate after he has accepted the consideration for its modification or abrogation.  It is for this reason that equity allows a performance or a substantial part performance of a contract, invalid because not in writing, modifying or abrogating a valid contract to be pleaded as a defense to an action on the valid contract.  To do otherwise would be to allow one of the parties to have the benefit of both contracts when in equity and good conscience he should have the benefit of but one.''

See, also, *Oregon & Wash. R. Co. v. Elliott Bay Mill & Lum. Co.,* 70 Wash. 148, 126 Pac. 406; *Stoner v. Fryett,* 91 Wash. 89, 157 Pac. 213.

The case now before us comes within the rule we announced in the *Gerard-Fillio* case; and, that being true, it follows that appellant had no right, after the $1,154.10 was paid him on August 21, to treat the contract as canceled and refuse to carry out his part of it.  At that time he had in his possession the guaranty by Keller and wife and the notes.  These were security to the amount of $4,500, when, at the most, there was only $1,154.10 owing to him, and, under the contract, but $800 of this amount was due and payable on August 21, when, in fact, respondent paid the entire amount of $1,154.10.  The remaining $354.10 was for logs delivered after the 1st of August and, under the contract, was not due until September 1.  Assuming that it was necessary for appellant, on August 21, to make a new promise, it would seem that this payment of $354.10 before due was sufficient consideration to support it.

The court, therefore, properly admitted and rejected evidence under the issues involved therein and properly submitted the case to the jury, and there is no

error as claimed by appellant in the giving or refusing of such instructions.

The admission of testimony by respondent as to how much money he had paid on the purchase price of the mill cannot be said to have had any tendency to injure the case of appellant; at least not to the extent that it constituted reversible error. It was a merely incidental and collateral matter and could not have been regarded by the jury as of any importance.

It is earnestly insisted by appellant that there was not sufficient evidence to submit to a jury that would justify a verdict for respondent. But it is clear that there was direct conflict in the testimony by the parties to the controversy upon the questions here at issue. There was no error in the refusal of the court to take the case away from the jury.

Some attempt is made to justify the refusal of appellant to deliver any more logs after receiving the $1,154.10, on the ground that a day or so after that time the mill was taken away from respondent, leaving him in no position to perform the contract. If appellant may be permitted to make such an assumption, it certainly may, with as much, or more, reason, be assumed that Keller and Johnson would not have taken steps to forfeit the conditional sale contract if appellant had on August 21 resumed deliveries of logs to respondent. Respondent entered into the original agreement with appellant for the purpose of milling logs which appellant was to deliver, and when appellant failed to deliver logs, he breached the contract and respondent was entitled to damages.

Appellant earnestly contends that the court did not submit the proper measure of damages to the jury under the instructions given and refused, urging that there was no proof of the market value of logs at any

other time than the 15th day of August, the date re-
spondent alleged the contract was breached. There
was a balance of two and one-half million feet of tim-
ber to be delivered. This was to be delivered in in-
stallments of not less than three hundred thousand feet
per month; so that it was optional with appellant to
deliver not more than this under the contract for deliv-
ery by installments; and as there is no proof of the
market value of logs at any date subsequent to August
15, it is contended that there was no proof to submit
to the jury upon which they could base a verdict.

*Alpha Portland Cement Co. v. Oliver,* 125 Tenn. 135,
140 S. W. 595, is quoted to this effect:

" 'The law is that where goods are to be delivered
in installments, or as requested by the purchaser, the
true measure of damages is the difference between the
contract price and the market price or values at the
times when such articles were required or ordered.'
*Sagola Lumber Co. v. Chicago Title, etc., Co.,* 121 Ill.
App. 298."

To the same effect are cited: *Crescent Hosiery Co.
v. Mobile Cotton Mills,* 140 N. C. 452, 53 S. E. 140,
6 Ann. Cas. 164; *Hill v. Chipman,* 59 Wis. 211, 18
N. W. 160; *Johnson & Thornton v. Allen & Jemison,*
78 Ala. 387, 392.

Appellant then says that this court cannot presume
that the market value of these logs went up at any
time after August 15, 1918. Neither can this court
presume that the market value of these logs went down
at any time after August 15, 1918. It can, however,
presume that, since the parties stipulated the market
value of the various grades of logs in controversy here
as of certain prices on August 15, 1918, which stipula-
tion was given to the jury, together with the prices
fixed thereunder, and since no evidence of an increase
or a decline in price was given by either party, that

price remained stationary for the time that this contract would have been enforced as to the deliveries, namely, during about eight months. There was evidence also before the jury that the cost of hauling the nearest logs, other than the logs covered by this contract, to the mill of respondent would have been in the neighborhood of $3 per thousand, which, in other words, would have added to the price of such logs by that much, or would have reduced the value thereof to respondent that much, and upon two and one-half million feet of logs would have amounted to $7,500, or more than the verdict awarded by the jury. This, of course, is not the measure of damages which the court submitted to the jury, which was that:

". . . if . . . the plaintiffs are entitled to recover a verdict at your hands, the measure of plaintiffs' damages will be the difference between the contract prices fixed for the different kinds and varieties of timber and the stipulated market prices or value of the different kinds and varieties of timber, plus what you shall find from the evidence would be the fair and reasonable cost of transporting other timber to the mill."

This instruction then gave the jury for their information the stipulation as to the amount of timber and the prices of different kinds and grades thereof.

But from circumstances of which we can take judicial knowledge as to the prices fixed for such timber by the War Industries Board, an agency of the Federal government in the prosecution of the war then being waged, from and after June 11, 1918, two months prior to the breach of this contract, to and including January 15, 1919, when the Federal government released control of the logging industry in this state, the price for such logs in the Puget Sound district ranged from $1 per thousand, for No. 1 and No. 3 fir, to $2

per thousand, for No. 2 fir, more than the stipulated prices of timber here involved on August 15, 1918. We will also take judicial knowledge of the fact that, after the Federal government released control of the logging industry in this state on January 15, 1919, there was a steady and increasing demand for all kinds of milling logs in this state; so that, under the circumstances, it cannot be presumed that the price of such logs declined, but, on the contrary, it may be presumed that the price increased. We are therefore of the opinion that appellant is not prejudiced by the submission of the measure of damages as it was submitted by the court to the jury, and the recovery thereon by respondent; and in the absence of an affirmative showing of prejudice thereby on the part of appellant, we are not now inclined to disturb it. We are inclined to think that the verdict was very moderate under the circumstances, and probably more favorable to appellant than he could expect from another trial.

We find no error in the record and the judgment is affirmed.

PARKER and BRIDGES, JJ., concur.

MAIN and MITCHELL, JJ., concur in the result.