[No. 20258. Department Two. March 15, 1927.]

THE STATE OF WASHINGTON, *Respondent*, v. ROY BOLEN, *Appellant*.[1]

[1] EVIDENCE (114, 120)—DOCUMENTARY EVIDENCE—EXEMPLIFICATION OR PROOF—REQUISITES AND NECESSITY. Upon the offer of records of the War Department, for the purpose of making an identification, it is not error to exclude evidence that they were private records, since that was a legal question for the court.

[2] SAME (16, 114, 120)—JUDICIAL NOTICE—ADMINISTRATIVE RULES— DOCUMENTS — ORIGINAL RECORDS — EXEMPLIFICATION OR PROOF. Since the courts will take judicial notice of the regulations of the War Department requiring the preservation of finger prints and service records of all members of the army, the original records kept are admissible in evidence without proof of their genuineness by the subordinates who took and filed them.

[3] CRIMINAL LAW (221)—EVIDENCE—RECEPTION—RIGHT OF ACCUSED TO CONFRONT WITNESSES. Const. Art. I, § 22, providing that the

[1]Reported in 254 Pac. 445.

accused shall have the right to meet the witnesses face to face, is not violated by the introduction in evidence of the original finger prints and service documents kept by the War Department, pursuant to its regulations, without evidence as to their genuineness by the subordinates who took and filed them.

[4] EVIDENCE (189)—OPINION EVIDENCE—VALUE. It is largely discretionary to permit evidence of the value of farm buildings to be given by a farmer who had known the buildings a number of years before they were burned, and who, from experience, knew the cost of materials and labor going into such buildings.

[5] EVIDENCE (82)—DEMONSTRATIVE EVIDENCE—ARTICLES SUBJECT OF OR CONNECTED WITH CONTROVERSY. Where a shoe, taken from a body, had attached to it a head of rye and was offered in evidence in that condition, error cannot be assigned on the failure to offer in evidence the head of rye, where there was evidence that the deceased had worked in a rye field the day before, and the head of rye was exhibited to the jury and the subject of comment without objection.

[6] HOMICIDE (121)—TRIAL—INSTRUCTIONS—DEGREE OF OFFENSE— NECESSITY OF INSTRUCTION AS TO LESSER OFFENSE. In a prosecution for first degree murder, it is proper to instruct as to second degree murder, where the theory and testimony of the state as to premeditation was contradicted by evidence from which the jury could find that the deed was done in the heat of passion during an altercation that took place the night of the killing.

[7] CRIMINAL LAW (288)—INSTRUCTIONS—CIRCUMSTANTIAL EVIDENCE. In a murder case, it is not error to instruct that strong circumstantial evidence is often the most satisfactory of any from which to draw the conclusion of guilt.

[8] CRIMINAL LAW (269, 329)—INSTRUCTIONS INVADING PROVINCE OF JURY—INSTRUCTIONS AFTER SUBMISSION OF CASE. Upon the failure of the jury to agree, it is proper to give further instructions to the effect that the jury ought to use every reasonable endeavor to reach a conclusion, to examine all questions with candor and with proper deference to the opinions of each other, and to agree if they could conscientiously do so, and to attempt to reach a conclusion.

[9] CRIMINAL LAW (241)—TRIAL—ARGUMENTS OF COUNSEL—COMMENT ON FAILURE OF ACCUSED TO TESTIFY. Error cannot be assigned in that the prosecutor argued that the accused did not say that he did not kill the deceased, in violation of Rem. Comp. Stat., § 2148, prohibiting comment on his failure to testify, where it appears from the record that the prosecutor referred

to an incident when the accused remained silent when accused
at the time the officers made a search.

Appeal from a judgment of the superior court for
Clark county, Simpson, J., entered April 2, 1926, upon
a trial and conviction of murder. Affirmed.

*Sparks & Snider,* and *Miller, Wilkinson & Miller,*
for appellant.

*Jos. E. Hall,* and *Dale McMullen,* for respondent.

BRIDGES, J.—By information filed by the prosecuting
attorney of Clark county, the defendant was charged
with murder in the first degree by feloniously and
with premeditated malice killing one Walter W. Flem-
ing, on or about the 29th day of July, 1925. The jury
brought in a verdict of murder in the second degree,
and judgment was entered thereon, from which defend-
ant has appealed. Several grounds for reversal have
been argued. The thorough briefs presented by the
attorneys for the respective parties have, of course,
been of great assistance to us.

The appellant owned a farm near the Columbia
river and about seven miles east of the city of Van-
couver, Washington. For some time prior to July 28,
1925, Walter W. Fleming had been and was on that
day working for him as a laborer on the farm. He
was last seen on the evening of July 28, working in one
of the fields. Some six days later, the headless body of
a man was found floating in the Columbia river several
miles below appellant's place. The head belonging to
the body was never found. The state claimed that this
was the body of Mr. Fleming, and in many ways sought
to so identify it.

On the night of Mr. Fleming's departure, nearly all
of the buildings on the farm belonging to the appellant

were destroyed by fire. The state undertook to show that he was quite heavily in debt, had mortgaged his farm and over-insured his buildings. It was the state's theory, at least in part, that he had set fire to these buildings for the purpose of getting the insurance, and at or about the same time killed Mr. Fleming with the view of charging the conflagration to him.

The state's evidence was largely circumstantial. For the purpose of identifying the headless body as being that of Mr. Fleming, the clothing and shoes which were found upon the headless body were identified and offered in evidence. There was some testimony to the effect that, some years prior to his death, Mr. Fleming had been a soldier in the United States army. For the purpose of more completely identifying the headless body, the state brought from the war department at Washington, D. C., Ernest R. Graves, the chief clerk in the adjutant-general's office. Through him there was introduced in evidence exhibits "K," "L" and "M," the first being the war department finger prints of a Walter W. Fleming, the second his enlistment record, and the third his service record. There was testimony tending to show that this was the Mr. Fleming who had been killed. The witness Graves testified that he had not made any of these records, but that they were found by him as original records filed in the war department office, and that he did not know who had made them. The state did not offer any testimony from the person who had made them. The introduction of these exhibits over the objection of the appellant is the ground for one of the chief arguments for a new trial. Additional facts will later be stated.

We will review the various assignments of error in the order in which they are discussed in appellant's brief.

[1] When the witness from the war department was on the stand, appellant, in connection with the state's offer of the finger prints, the enlistment and the service record which we have mentioned, sought to show by him that these records were of a private nature and that they were not open for public inspection. The court sustained an objection, and this ruling is claimed to have been erroneous. Manifestly, this witness could state nothing more than he had stated, that is, that these exhibits were a part of the records of the war department. He could not testify whether they were public or private records of that department. In addition to that, the question was one of law for the court to decide. This question is involved in the next succeeding discussion, and will there receive further consideration.

[2] The appellant's most serious objection, however, is to the introduction of these records without any extrinsic testimony identifying them, that is, direct testimony to the effect that the finger prints shown in exhibit "K" were actually taken from the fingers of the Fleming mentioned in the records. He contends that these documents cannot prove themselves. The state contends that they are public records required by law to be kept, and since they are the originals, they are admissible in evidence without extraneous proof of their genuineness. It further contends that they are made admissible by virtue of Rem. Comp. Stat., §§ 1257 and 1260 [P. C. §§ 7776 and 7774]. The first section is as follows:

"Copies of all records and documents on record or on file in the offices of the various departments of the United States and of this state, when duly certified by the respective officers having by law the custody thereof, under their respective seals, where such offi-

cers have official seals, shall be admitted in evidence in the courts of this state."

And § 1260 reads:

"Whenever any deed, conveyance, bond, mortgage, or other writing shall have been recorded or filed in pursuance of law, copies of record of such deed, conveyance, bond, or other writing, duly certified by the officer having the lawful custody thereof, with the seal of the office annexed, if there be such seal, if there be no such seal, then with the official certificate of such officer, shall be received in evidence to all intents and purposes as the originals themselves."

The appellant contends that these two sections do nothing more than authorize copies of records and documents to be admitted in evidence when the originals would be admissible, and that the statutes do not undertake to make such documents competent. We think we will not here determine the purpose of these statutes, but will go at once to a discussion of certain fundamental rules of evidence touching the admissibility of such documents.

Upon reason and from the authorities, it is manifest that, even without such statutes certain documents more or less similar to those involved here would be admissible. We think the following may be gathered from the many authorities we have read on the subject: Documents of this general character, when relevant and material, are admissible in evidence, if they are required to be kept by a major or important office or department of the Federal government by virtue of statute or by virtue of rules and regulations reasonably necessary to the proper conduct of such office or department, such rules and regulations being either directly authorized by acts of Congress or are not inconsistent with or violative of any statute, and such document is of public interest and its keeping is of such character

as that it can be said that the general public has knowledge of it and it is the record of a fact as distinguished from an opinion, judgment or discretion; and that the courts will take judicial notice of all Federal statutes and of such rules and regulations made by Federal officers or heads of departments as are of such public interest that it can be said, without reasonable debate, the public must know of them.

It may be that the foregoing statement omits some isolated conditions, but we think it sufficiently accurate for the purpose of the discussion of the question involved.

It is also probably true that the courts will not take judicial notice of facts, acts, records, documents, rules or regulations which are of a private nature and which, because of their character, are not likely to be known to the general public.

It has been held that the courts will take judicial notice of regulations of the department of agriculture pertaining to the inspection of wheat, *United States v. Rohe,* 218 Fed. 182; of regulations promulgated by the postmaster general concerning sending medicine through the mails, *Bruce v. United States,* 202 Fed. 98; of rules and regulations of the secretary of war concerning navigation of canals, *United States v. Moody,* 164 Fed. 269; of rules of the general land office with respect to homestead entries, *Nurnberger v. United States,* 156 Fed. 721; of regulations concerning the manufacture, sale etc., of oleomargarine, *Wilkins v. United States,* 96 Fed. 837; of rules of the secretary of war prohibiting the maintenance of bawdy houses within certain distances of a military post, *United States v. Casey,* 247 Fed. 362. The following cases are of like nature: *United States v. Scott,* 248 Fed. 361; *United States v. Miller,* 249 Fed. 985; *Kansas City*

*Southern Ry. Co. v. State,* 90 Ark. 343, 119 S. W. 288; *State v. Seaboard Air Line Ry.,* 169 N. C. 295, 84 S. E. 283; *Monroe County v. May,* 67 Ind. 562.

It has also been held by the courts that certain acts, records and documents required to be done or kept by certain public officers in pursuance of their duties will be received in evidence without extrinsic testimony concerning their genuineness or correctness. On a charge of forgery of the name of the supposed maker of a power of attorney, the state offered in evidence a certified copy of the official record showing that the person who was supposed to have signed the document died on the date of its purported execution. Statutes provided that records of deaths be kept by certain persons. This court held that a certified copy of this record was admissible in evidence without further proof concerning it. *State v. Johnson,* 122 Wash. 394, 210 Pac. 774.

In *Ward v. Moorey,* 1 Wash. Terr. 104, this court held that the register of the United States local land office is a public officer and his records may be proved by certified copies, and that the acts of the person holding that office cannot be impeached collaterally.

In *Cherry Point Fish Co. v. Nelson,* 25 Wash. 558, 66 Pac. 55, this court affirmed a judgment based on facts shown by the tide tables prepared by the United States government showing the depth of the waters of Puget Sound at a certain time and place. In *Anderson v. Hilker,* 38 Wash. 632, 80 Pac. 848, we held that the records of the office of the United States weather bureau were competent to show the condition of the weather at a certain time and place. To the same effect is *Peterson v. Arland,* 79 Wash. 679, 141 Pac. 63. In *Clements v. Cook,* 112 Wash. 217, 191 Pac. 874, we took judicial notice of prices fixed by the war industries board on timber during a certain period.

In *White v. United States,* 164 U. S. 100, 41 Law. Ed. 365, the defendant was being prosecuted for presenting false claims. The government offered in evidence a record kept by a certain sheriff's office, showing the release and discharge of prisoners. It was claimed that this document was incompetent, but the supreme court upheld its admission, saying:

"A jailer of a county jail is a public officer, and the book kept by him was one kept by him in his capacity as such officer and because he was required so to do."

In *State v. Torello,* 103 Conn. 511, 131 Atl. 429, the state offered in evidence a certified copy of the record of a state chemist for the purpose of proving the alcoholic contents of certain liquors. The court held that the testimony was properly received, saying:

"The state chemist was a public officer, sworn to the proper performance of his official duty. The making of this record and certificate were official acts, and presumptively show that the official acted in the performance of his duty. . . . The making of this certificate legal evidence of the facts required to be stated in the record kept by the state chemist is upon the same basis as the record of births, deaths and marriages, which since 1664, has been required to be kept by a public official, and duly certified copies of these are admitted in evidence in proof of the facts required to be recorded."

It has also been held that a record of a marriage, which record the law required to be kept, was admissible. *Eva v. Gough,* 93 Conn. 38, 104 Atl. 238; that the records of the United States weather bureau were admissible to show the condition of the weather at a certain time and place. *Mears v. New York, N. H. & H. R. Co.,* 75 Conn. 171, 52 Atl. 610. In *State v. Schweitzer,* 57 Conn. 532, 18 Atl. 787, it was held that a marriage certificate was admissible as original evi-

dence in proof of the marriage. See, also, *Commonwealth v. Slavski*, 245 Mass. 405, 140 N. E. 465, 29 A. L. R. 281; 23 C. J. 95; 16 C. J. 525; 15 R. C. L. 1109; *Gottstein v. Lister*, 88 Wash. 462, 153 Pac. 595, Ann. Cas. 1917 D, 1008; *Evanston v. Gunn*, 99 U. S. 660.

In *Burke v. Miltenberger*, 19 Wall. 519, the court refused to take judicial notice of orders issued by a military commander in the exercise of his authority. In *Spring v. American Tel. & Tel. Co.*, 86 W. Va. 192, 103 S. E. 206, 10 A. L. R. 951, the court refused to take judicial notice of the conditions upon which the telephone and telegraph systems were taken over by the government during the war, for the reason that only the government and the proprietary companies had any special interest in that subject. In *State v. Gottlieb*, 21 N. D. 179, 129 N. W. 460, the court refused to receive in evidence a list of special taxpayers furnished by the collector of internal revenue. In *State v. Schmidt*, 128 Wash. 661, 223 Pac. 1057, this court refused to take judicial notice of the rules and regulations promulgated by the state fisheries board because they were not of common and general knowledge. We there, to some extent, criticised our holding in *Clements v. Cook, supra*, and it may be that the doctrine there announced goes to the extreme limit. In the *Schmidt* case will be found our latest expression on this subject. We said:

"Courts of this state may take judicial notice of such Federal rules, orders and regulations as may be said by long existence or widespread and acknowledged notoriety to be, or ought to be, generally known within the limits of their jurisdiction."

The respective parties have cited many additional cases, but we think the foregoing sufficient for an understanding of the general rule.

While there is probably no act of Congress which expressly directs that the secretary of war shall take and keep finger prints of enlisted men and enlistment and service records, yet that department is authorized to make necessary rules and regulations. For instance, § 235, U. S. Comp. Stats., reads:

"The head of each department is authorized to prescribe regulations, not inconsistent with law, for the government of his department, . . ."

It seems to us that most men must know that the war department has promulgated rules and regulations which require the preservation of finger prints of all members of the United States army and the making and keeping of service records, and that such rules have for years past been uniformly complied with, and that such rules and the documents prepared thereunder are of such great importance and so vitally necessary that the courts must take judicial notice of them and that such documents are receivable in evidence without extrinsic proof of their correctness or verity. The mere fact that they are kept as they are is *prima facie* proof of their genuineness. The circumstances themselves show the necessity for the adoption of such a rule. The war department has, of course, taken the finger prints of many hundreds of thousands of enlisted soldiers. These have actually been taken by many subordinates who are now scattered throughout the world, and many of whom are dead. Unless the very manner of keeping these things is proof in itself of the recited facts, then they would be of very little value.

[3] But appellant further contends that the admission of these exhibits violated § 22 of article I of our constitution, which provides that in all criminal cases the accused shall have the right to meet the witnesses

against him face to face. Similar provisions are in the constitutions of many of the states and it has often been held that they have no application to proof of facts in their nature documentary and which can be proved only by the original or authenticated copy. This question has been so thoroughly discussed and re-viewed by eminent authorities that we do not feel justified in again undertaking to cover the field. The following leading cases show conclusively that the admission in evidence of the exhibits in question did not violate any of the appellant's constitutional rights. *United States v. Swan,* 7 N. M. 306, 34 Pac. 533; *State v. Dowdy,* 145 N. C. 432, 58 S. E. 1002; *Commonwealth v. Slavski, supra; People v. Love,* 310 Ill. 558, 142 N. E. 204; *State v. Torello, supra.*

One or two other objections are made to the introduction of these exhibits, but we consider them of minor importance and without substantial merit.

[4] It is next claimed that the court erred in permitting a witness for the state to testify concerning the value of the buildings which were destroyed, because he had not duly qualified himself. Questions of this character are largely in the discretion of the trial court, and that discretion will not be interfered with, unless it has been abused to the prejudice of the accused. *Czarecki v. Seattle etc. Co.,* 30 Wash. 288, 70 Pac. 750; *Kranzusch v. Trustee Co.,* 93 Wash. 629, 161 Pac. 492. The witness was a combined farmer and mechanic. He had known the buildings in question for a number of years and had seen them shortly before the fire. He had recently constructed a small building and bought the materials therefor, and knew in a general way the cost of materials and of labor. Under these circumstances, we will not say that the court was not justified in allowing the witness to testify as to the value of the buildings.

[5] When the body of the dead man was found floating in the river, it had on its feet a pair of shoes. Sticking in one of the heels was a head of rye. The shoe was preserved in the same condition in which it was found and thus offered in evidence. There was some testimony to the effect that the day before the deceased disappeared he was plowing in a field on appellant's place where there had been rye. The shoe was offered in evidence, but there was no particular mention made of the head of rye. Later, the court, over the objections of the appellant, allowed this head of rye to go to the jury along with the shoe, and this situation forms the next claim of error. We are unable to see much merit in this contention. While it may have been more orderly if the head of rye had been specially offered, yet, since it had attached itself to the shoe and the latter had been offered and received in evidence, it seems to us that it was a part of the exhibit. This ought to be so, particularly because the rye was exhibited to the jury and testimony with reference to it taken. Plainly, the appellant was neither surprised nor prejudiced.

[6] It is next contended that the court erred in giving the jury an instruction with reference to second degree murder. Several of our cases are cited to the effect that it is proper, in a charge of murder in the first degree, to submit the lesser offense, provided there is testimony upon which the jury could return a verdict of murder in the second degree, but that where there is an entire absence of such testimony and the proof shows that the defendant is either innocent or guilty of murder in the first degree, it would be erroneous for the court to submit the question of second degree murder. *State v. Robinson,* 12 Wash. 349, 41 Pac. 51, 902; *State v. McPhail,* 39 Wash. 199, 81

Pac. 683; *State v. Pepoon,* 62 Wash. 635, 114 Pac. 449; *State v. Whitfield,* 129 Wash. 134, 224 Pac. 559; *State v. Donofrio,* 141 Wash. 100, 250 Pac. 951. The argument is that the testimony here conclusively shows that, if appellant killed Fleming, he did it premeditatedly and with malice. It is pointed out that the state's theory was that appellant had deliberately killed Fleming so that he could burn his own farm buildings, collect the insurance, and charge the crime to Fleming.

It is true that the state introduced much testimony along this line in an effort to show a motive for the alleged crime, and if there were nothing else in the record, the appellant's contention would probably have to be sustained. But there is testimony to the effect that shots were heard about the time it is alleged that the murder was committed; that, on that evening the appellant had been away from his farm and returned about nine o'clock at night; that, shortly after his return, he heard a noise in the barn and told Fleming that he believed the calf was loose, and, if so, it might be killed by the other stock; that he and Fleming, the latter being only partially dressed, then went to the barn, and found the calf loose, and in an effort to catch it, it ran out into the field; that Fleming then got angry, said that he was not going to work all day and all night, too, in addition to cooking his own dinner; that he said he was going to quit and was going away that night, and that he told appellant that he would rue the day that they ever met; that the deceased then left, taking appellant's dog with him, and that appellant had stated that he had some thought of getting a gun and stopping the deceased from going away, but that he had not so done. There is considerable testimony in the record along this line. Plainly, the jury had a right to believe that the appellant killed

Fleming, and also had a right to disbelieve the state's testimony with reference to the motive for so doing, and to believe that, during the altercation which we have just recited, the killing was done in the heat of passion and without that premeditation necessary to constitute murder in the first degree. We feel confident that, under this testimony, it was not only the privilege of the court to submit the question of murder in the second degree, but that it would have been error to have refused a request to so instruct. *Territory v. Padilla,* 8 N. M. 510, 46 Pac. 346.

[7] Instruction No. 13 told the jury that there were two kinds of testimony, direct and circumstantial, and defined each, saying that the jury must be convinced beyond a reasonable doubt, whether the testimony be direct or circumstantial, and that "strong circumstantial evidence is often the most satisfactory of any from which to draw the conclusion of guilt." Objection is made to that portion of the instruction which we have quoted. We think it is unobjectionable. It is a statement of a fact which everybody knows, and touches the actual merits of the case in but a distant way. In *State v. Ito,* 129 Wash. 402, 225 Pac. 63, the instruction was concerning circumstantial evidence and stated that it was many times quite as "conclusive in its convincing power as direct and positive evidence," and we did not find any valid objection to it.

[8] After the jury had been deliberating upon its verdict for hours, they sent a note to the court stating that they seemed to be unable to agree. Thereupon the court told them that he had no further instructions to give at that time except to remind them that they ought to use every reasonable endeavor to reach a conclusion, and that he would allow them to deliberate further. Some hours after that, they again re-

ported that they were unable to agree, and the court then gave them a further instruction, which is designated as "Instruction A". It is too long to be here copied. The substance of it is that, although the verdict to which a juror agrees must be his own verdict and not a mere acquiescence in the conclusion of his fellows, yet, in order to bring twelve minds to a unanimous result, the jury must examine all questions with candor and with proper deference to the opinions of each other; that some jury must determine the question and that this jury was selected from the same source and in the same general way that any other would be obtained, and that there is no reason to believe that any other jury would be more competent than this one and that it was its duty to decide the case if it conscientiously could so do; that in conferring together the jury ought to pay proper respect to each other's opinions and listen with a disposition to be convinced, and that

"the court does not wish to indicate by this instruction that it is trying to compel the jury to arrive at a conclusion one way or another, but simply feels that it is its duty to remind the jury that they ought again attempt to reach a conclusion."

Thereafter the jury again retired, and later brought in a verdict of murder in the second degree and recommended clemency.

This same instruction seems to have been first given under similar circumstances as reported in *Commonwealth v. Tuey,* 8 Cush. (Mass.) 1, where it was entirely approved. Practically the same instruction was again reviewed in *Allen v. United States,* 164 U. S. 492, and in *Territory v. Donahue,* 16 N. M. 17, 113 Pac. 601, and approved. We are unable to see anything in the instruction prejudicial to the appellant.

[9]    The last error assigned is alleged misconduct of the prosecuting attorney while arguing the case to the jury. The part of the argument which is objected to is this:

"If Mr. Bolen didn't kill him, all that he needed to say was that he didn't do so, but he didn't say that."

Appellant contends that this remark was a comment upon his failure to testify, in violation of Rem. Comp. Stat., § 2148 [P. C. § 9214], which makes it the duty of the court to instruct the jury

". . . that no inference of guilt shall rest against the accused if the accused shall fail or refuse to testify as a witness in his or her own behalf."

In *State v. McCormick,* 127 Wash. 288, 220 Pac. 808, we held that it was unlawful for the prosecuting attorney to comment upon the defendant's failure to testify. The whole of the argument is not in the record and it is somewhat difficult for us to determine in what connection the criticised remark was made. The prosecuting attorney in his brief says that he referred to the testimony of one of the witnesses for the state, as follows:

"Q. Did Mrs. Bolen say anything about the officers' search? A. Yes, she said they were just going at it as if you (defendant) knocked him in the head and burned the buildings yourself. Q. Did he (the defendant) say anything? A. No, sir, he didn't make any comment that I remember."

It is probable that the comment of the prosecuting attorney was concerning this matter, and, if so, it would not be objectionable. Certainly, under the circumstances, we cannot say that he intended to comment on the failure of appellant to testify.

The judgment is affirmed.

MACKINTOSH, C. J., TOLMAN, ASKREN, and PARKER, JJ., concur.